**UNITED STATES of America,**
**Plaintiff,**

v.

**WHITE MOTOR COMPANY, Defendant.**
**Civ. A. No. 34593.**

United States District Court
N. D. Ohio, E. D.
April 21, 1961.

Robert B. Hummel, Frank B. Moore, John D. Shaw, Antitrust Div. Dept. of Justice, Cleveland, Ohio, for plaintiff.

Robert W. Wheeler and John H. Watson, Jr., M. B. & H. H. Johnson, law firm, Cleveland, Ohio, for defendant.

KALBFLEISCH, District Judge.

This action was instituted June 30, 1958, by the United States under Section 4 of the Sherman Act (15 U.S.C.A. § 4), charging that, beginning on or about January 1, 1955, defendant, The White Motor Company, hereinafter called White, or defendant, and certain co-conspirators consisting of its various dealers and distributors, have engaged in an unlawful combination and conspiracy in violation of Sections 1 and 3 of the Act (15 U.S.C.A. §§ 1, 3).

The amended complaint charges that White, its distributors and dealers have combined and conspired to restrain interstate commerce by entering into agreements whereby: each distributor and dealer will sell White trucks only to dealers or other buyers who have a place of business or purchasing headquarters within the distributor's or dealer's assigned territory, (Complaint, par. 17(a)); if distributors or dealers sell White trucks outside their specified assigned territories they are obliged to pay certain sums of money to the dealers or distributors in whose territories such White trucks are first registered or placed in initial service, (Complaint, par. 17(b)); distributors and dealers will not sell White trucks to others for resale, (Complaint, par. 17(c)), or to any Federal or State Government or any department or political subdivision thereof, such sales being reserved exclusively by White for direct sales, (Complaint, par. 17(d)); distributors will sell White trucks and parts to dealers at prices fixed by White, (Complaint, par. 17(e)); and distributors and dealers will sell White parts to customers designated by White as National Accounts, Fleet Accounts, and to Federal and State Governments at prices fixed by White, (Complaint, par. 17(f)). The Government charges that White is continuing and will continue the offenses alleged unless enjoined. The relief requested is that White be perpetually enjoined from continuing the alleged conspiracy and from continuing or renewing any of the provisions of its contracts fixing resale prices of White trucks and parts or imposing limitations or restrictions on the territories within which or persons to whom White distributors and dealers may sell trucks.

Defendant has admitted most factual allegations but has denied all charges of illegal conduct. The Government moved for summary judgment on the basis of the pleadings, defendant's answers to interrogatories, the deposition of the defendant's secretary, and accompanying exhibits consisting of representative copies of the contracts and a White distributor and dealer organization chart.

Under Rule 56(c), Federal Rules of Civil Procedure, 28 U.S.C.A., a motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

From the pleadings and exhibits the Court finds that:

Defendant is an Ohio corporation with its principal place of business at Cleveland. (Complaint, par. 3, Answer, par. 3.) It manufactures White and Autocar trucks and truck parts, hereinafter referred to as White trucks and parts, at Cleveland, Ohio, and Exton, Pa., which are sold throughout the United States and the District of Columbia. (Complaint, par. 7, 12, Answer, par. 7, 12.)

After manufacture, White trucks and parts are sold through over two hundred persons, firms or corporations designated by White as "franchised distributors," hereinafter called distributors. Distributors, in turn, sell White trucks and parts at wholesale to over eighty franchised dealers and others. The term "dealer," as used herein, includes the terms "key dealer," "metropolitan deal-

er," and "dealer" and means any person, firm or corporation so designated by a distributor, with the approval of White, as a retail seller of White trucks and parts. Dealers purchase White trucks and parts from distributors. The term "direct dealer," includes the more than twelve "direct key dealers," "direct metropolitan dealer," and "direct dealers," which are persons, firms or corporations so designated by White as retail sellers of White trucks and parts, to whom White sells its trucks and parts directly. Distributors, dealers and direct dealers are located throughout the United States and the District of Columbia. (Complaint, par. 9, 10, 12, 13; Answer, par. 9, 10, 12, 13; Plaintiff's Exhibit 36.)

In addition to selling through distributors, dealers and direct dealers, defendant sells White trucks and parts directly to consumers, some of whom are designated as "National Accounts," and to various governmental divisions designated herein as "Government Accounts." (Complaint, par. 12, 13, 14; Answer, par. 12, 13, 14.)

There is a continuous flow in interstate trade and commerce of White trucks and parts from White's manufacturing plants in Ohio and Pennsylvania, through distributors, dealers and direct dealers, to consumers located throughout the United States and the District of Columbia, and from White manufacturing plants in Ohio and Pennsylvania and its sales and service branches directly to consumers located throughout the United States and the District of Columbia, some of which are sometimes designated "National Accounts," and the sales to some of which are sometimes called "Government Sales." (Complaint, par. 14; Answer, par. 14.)

White is one of the leading United States manufacturers of medium to heavy duty trucks and parts therefor (Complaint, par. 15; Answer, par. 15).

The total volume of sales of White trucks by defendant to its various classes of customers was $102,928,000 in 1955, $116,110,000 in 1956, $127,471,000 in 1957, and $92,699,000 during the first seven months of 1958. (Defendant's Answer to Interrogatory No. 7, Ex. J, more fully set forth in Appendix A of this memorandum.)

Total sales of White truck parts by defendant in each of the years 1955, 1956, and 1957 exceeded $41,000,000 and were over $25,000,000 for the first seven months of 1958. (Defendant's Answer to Interrogatory No. 8, Ex. J–1.)

Sales of White truck parts by defendant to the United States Government amounted to $2,755,000 in 1955, $915,-000 in 1956, $475,000 in 1957, and $761,-000 for the first seven months of 1958. (Defendant's Answer to Interrogatory No. 8, Ex. J–1.)

The Court further finds that:

At the deposition of Alfred Dixon Edgerton, Secretary of White, copies of thirty-five contracts were authenticated and identified as being representative of all of the various forms of agreements used by defendant throughout its distribution system during the period involved which contain the clauses relevant to this action. (Tr. 28–40.)

Exhibits 1–16, inclusive, consist of Distributor's Selling Agreements, Form 626, at least 251 of which were executed or in effect during the relevant period. The printed portions of all of the Form 626 contracts are identical. (Tr. 29, 30.) (It is noted that Exhibit 2 bears the form number 604 but, in view of the testimony and by comparison of the documents, it is apparent that the last page bearing the form number 604 is that of another exhibit and that Exhibit 2 is Form 626.)

Exhibits 17–20, inclusive, consist of Direct Key Dealer Selling Agreements, Form 631, eighteen of which were executed or in effect during the relevant period. The printed portions of all of the Form 631 contracts are identical. (Tr. 31.)

Exhibits 21–23, inclusive, consist of Direct Dealer Selling Agreements, Form 627, five of which were outstanding during the relevant period. The printed portions of all of the Form 627 contracts are identical. (Tr. 32.)

Exhibits 24–32, inclusive, consist of Key Dealer Selling Agreements, Form 682, approximately sixty-two of which were in effect during the relevant period. (Ex. 36.) The printed portions of all Form 682 contracts are identical. (Tr. 36, 37.)

Exhibit 33 consists of a Dealer Selling Agreement, Form 713, approximately twenty-two of which were in effect during the relevant period. The printed portions of all Form 713 contracts are identical. (Tr. 39.)

Exhibits 34 and 35 consist of Metropolitan Dealer Selling Agreements, Form 604, of which two were outstanding during the relevant period. Printed portions of all Form 604 contracts are identical. (Tr. 40.)

Exhibit 36 consists of a graphic representation of White's distribution system prepared in the normal course of business by White for, and at the request of, the Federal Bureau of Investigation. It is initialed and dated "10/22/57" and indicates the number of White's distributors, dealers and direct dealers and their relationships to each other. (Tr. 20.)

White is a party to all selling agreements with distributors, direct key dealers, direct metropolitan dealers, and direct dealers. White also is a party to all selling agreements between its distributors and key dealers, metropolitan dealers, and dealers, its approval and signature being necessary to validate the agreements.

White provides standard form selling agreements which its distributors are required to use when entering into contracts with key dealers, metropolitan dealers and dealers. (Par. 9, Distributor Selling Agreement, Form 626.)

Distributor Selling Agreements

The Court further finds that:

Paragraph 1 of the Distributor Selling Agreements, Form 626, provides:

"1. *Selling Privilege and Territory.* Distributor is hereby granted the exclusive right, except as hereinafter provided, to sell during the life of this agreement, in the territory described below, White and Autocar trucks purchased from the Company hereunder." (Thereafter, in each contract is inserted a description of a different geographical area, usually in terms of subdivisions of states or counties.)

In addition to the geographical limitations, certain of the seventeen Distributor Selling Agreements submitted to the Court in connection with this motion contain the following selling restrictions:

Exhibit 1, between White and John L. Boitano White Truck Sales, of Petaluma, Calif., prohibits the distributor from selling "fire truck chassis to the State of California and all political subdivisions thereof."

Exhibit 4, between White and Willey White Truck Co., of Terre Haute, Ind., prohibits that distributor from selling to "Eastern Motor Express, Inc., Vigo Tractor Rentals, Inc., and/or any subsidiary or affiliated companies."

Exhibit 5, between White and Fremont White Truck Sales and Service, of Fremont, Ohio, permits that distributor to sell in Seneca County only to the "account of Paul Gilmore, Inc."

Exhibit 6, between White and Sutton-White Truck Company, of Sacramento, Calif., prohibits that distributor from selling "fire truck chassis to the State of California and all political subdivisions thereof."

Exhibit 11, between White and Midway Garage & Service, Inc., of Monroeville, Ohio, prohibits that distributor from selling to "Mohawk Motor, Inc., and Paul Gilmore, Inc." in Seneca County.

Exhibit 13, between White and Carl Mayr, d. b. a. Poplar White Truck & Equipment Co., of Erie, Pa., permits that distributor to sell in Warren County to the "Account of Hammond Iron Works only."

Paragraph 2 of the Distributor Selling Agreements provides:

"*Merchandising Agreement.* Distributor agrees to develop the aforementioned territory to the sat-

isfaction of Company, and not to sell any trucks purchased hereunder except in accordance with this agreement, and not to sell such trucks except to individuals, firms, or corporations having a place of business and/or purchasing headquarters in said territory.

"Distributor agrees not to sell nor to authorize his dealers to sell such trucks to any person, firm or corporation for resale by such person, firm or corporation, unless the right to do so is specifically granted by Company in writing. (Company Branches, Company approved distributors, direct key dealers, and direct dealers, and Distributor's key dealers and dealers are accepted throughout this paragraph.) Distributor further agrees not to sell nor to authorize his dealers to sell such trucks to any Federal or State government or any department or political subdivision thereof, unless the right to do so is specifically granted by Company in writing. Distributor further agrees to maintain a sales room and service station adequate for the sale and servicing of White and Autocar trucks in said territory and to purchase and display about his place of business authorized sales and service signs, the number of signs and their location to be determined by mutual agreement."

Paragraph 9 of the Distributor Selling Agreements provides:

"*Dealer Appointments.* Distributor may, in order to further the sale thereof, appoint key dealers or dealers to sell and service White trucks and White parts within his territory, the key dealers or dealers so appointed and their locations to be subject to Company's approval. For this purpose Distributor shall use only the Company's standard forms—'White Key Dealer Selling Agreement' and/or 'White Dealer Selling Agreement.'[1] Distributor will give Company advance notice of the cancellation of any such key dealer or dealer agreement."

Paragraph 10 of the Distributor Selling Agreements provides:

"*Wholesale Override on Chassis Sales to Key Dealers.* In the event Distributor sells at wholesale to any of his key dealers any new White standard truck listed in 'Price List— Appendix A' or 'Price List—Appendix B' and purchased hereunder, Company agrees to allow Distributor an amount which shall be called 'Override' in addition to the discounts provided for in Article 5 above and the 'Annual White and Autocar Truck Bonus' provided for in Article 7 above. The amount of the override shall be that specified for each model of new White truck listed in 'Price List—Appendix A' and 'Price List—Appendix B.' * *

"The override referred to in this section shall be paid to Distributor within thirty days after the receipt by Company's designated office of such report, subject, however, to the following conditions:

(a) that with respect to all the trucks so reported sold, all the terms, provisions and requirements of this Agreement and of the Key Dealer Selling Agreement and particularly as to standard prices and discounts, shall have been complied with and performed."

Paragraph 13 of the Distributor Selling Agreements provides:

"*National Account and Government Sales.* Company reserves the right to sell direct in the above described territory, to any firm, corporation or subsidiary of the latter designated by Company as a 'National Account,' as well as to the Federal or any State Government, or any department or political subdivision thereof, without any obligation whatever on the part of Com-

[1]. See below with respect to Dealer Selling Agreements.

pany to Distributor except as hereinafter provided."

Paragraph 15 of the Distributor Selling Agreements provides:

"*Parts Sales to National and Fleet Accounts.* Distributor agrees to extend to firms and corporations, and subsidiaries of the latter, designated by Company as 'National Accounts' or 'Fleet Accounts,' and to the Federal and State Governments and departments and political subdivisions thereof, the same discounts on parts and accessories as authorized and allowed the aforementioned accounts by Company."

Paragraph 21 of the Distributor Selling Agreements provides:

"*Distributor Not Company's Agent.* It is not the intent that Distributor possess any authority or power of agency under this contract, nor that he shall have any right or authority to enter into contracts for or on behalf of Company or make promises or representations relative to Company's product other than contained in Company's standard warranty."

Paragraph 23 of the Distributor Selling Agreements provides:

"*Right of Cancellation.* This agreement and any renewal or extension thereof may be cancelled and terminated as below provided:

"(d) Notwithstanding the provisions of paragraphs (b) and (c) next preceding, Company may, at its option, cancel and terminate this agreement at any time without any notice whatsoever to Distributor * * * in case of breach of this agreement on the part of Distributor;"

### Dealer and Direct Dealer Selling Agreements

The Court further finds that:

Direct Dealer (Form 627), Direct Key Dealer (Form 631), Metropolitan Dealer (Form 604), Key Dealer (Form 682), and Dealer (Form 713), Selling Agreements, all contain the following provisions:

"*Selling Privilege and Territory.* [Type of dealer] is hereby granted the exclusive right, except as hereinafter provided, to sell during the life of this agreement, in the territory described below, White trucks purchased from Company hereunder." (Then follows in each contract an inserted description of a geographical area, usually a city, county, or portions thereof. Exhibits 17 and 24 also include provisions excluding the sale of fire truck chassis to the State of California and all political subdivisions thereof.)

"*Merchandising Agreement.* [Type of dealer] agrees to develop the aforementioned territory to the satisfaction of Company, and not to sell any trucks purchased hereunder except in accordance with this agreement, and not to sell such trucks except to individuals, firms, or corporations having a place of business and/or purchasing headquarters in said territory.

"[Type of dealer] agrees not to sell such trucks to any person, firm or corporation for resale by such person, firm or corporation, nor to sell such trucks to any Federal or State Government or any department, or political subdivision thereof, unless the right to do so is specifically granted by Company in writing."

"*Prices, Discounts and Terms.* [Company or Distributor] agrees to sell to [Type of Dealer] at Company's factory at Cleveland, Ohio, new White truck standard chassis, including standard equipment and accessories mounted thereon, for cash in par funds at the respective prices and subject to the discounts, terms and provisions or at the [Type of Dealer] net prices and subject to the terms and provisions set forth in [Type of Dealer] 'Price List—Appendix A,' 'Price List—Appendix B,' and the latest issue

·of Company's sales handbook, all ·of which are subject to change without advance notice. The 'Price List—Appendix A,' and 'Price List —Appendix B,' will be issued by ·Company from time to time and the latest issue thereof shall become .and be a part of this agreement."

"*National Account and Government Sales.* Company reserves the right to sell direct in the above described territory, to any firm, corporation or subsidiary of the latter designated by Company as a 'National Account,' as well as to the Federal or any State Government, or any department or political subdivision thereof, without any obligation whatever on the part of Company to [Type of Dealer]."

"*Parts Sales to National and Fleet Accounts.* [Type of Dealer] agrees to extend to firms and corporations, and subsidiaries of the latter, designated by The White Motor Company as 'National Accounts' or 'Fleet Accounts,' and to the Federal and State Governments and departments and political subdivisions thereof, the same discounts on parts and accessories as authorized and allowed them by The White Motor Company."

"*Parts Sales and Discounts.* [Company or Distributor] will sell to [Type of Dealer] new White parts and accessories listed in the latest revised parts books of The White Motor Company at the prices and discounts and on the terms and conditions as provided in the aforementioned 'Price List—Appendix A,' and (or) 'Price List—Appendix B.' "

"*Performance of Agreement.* * * * It is further understood and agreed that full performance of this agreement by [Type of Dealer] is a condition precedent to performance thereof by [Company or Distributor] and that any failure by [Company or Distributor] to enforce

or to require performance by [Type of Dealer] of any provision of this agreement or to exercise any option herein granted, shall in no way affect the validity of this agreement or impair the right of [Company or Distributor] later on to enforce any such provision or exercise any such option."

In addition to the above clauses, the Direct Dealer and Direct Key Dealer contracts provide that:

"*[Type of Dealer] Not Company's Agent.* It is not the intent that [Type of Dealer] possess any authority or power of agency under this contract, nor that he shall have any right or authority to enter into contracts for or on behalf of Company or make promises or representations relative to the products of Company other than contained in the standard warranty of Company."

The Dealer, Metropolitan Dealer and Key Dealer Selling Agreements contain the following provision:

"*[Type of Dealer] Not Agent.* It is not the intent that [Type of Dealer] possess any authority or power of agency under this contract, nor that he shall have any right or authority to enter into contracts for or on behalf of Distributor or The White Motor Company, or make promises or representations relative to products of The White Motor Company other than contained in the standard warranty of said Company."

### Truck Resale Prices

The Court further finds that:

Distributor Selling Agreements and the Dealer Selling Agreements require all distributors to resell White trucks, standard equipment, accessories and parts to dealers at the prices, discounts and terms established by White. Defendant so admits at page 54 of its Brief.

None of the contracts herein require distributors, dealers or direct dealers to·

sell White trucks to consumers at specified prices.

### Resale Prices of Parts

Defendant admits (Brief, p. 55) (and the contracts under consideration would permit no other construction) that it has entered into agreements with its distributors, dealers and direct dealers, and has required its distributors to enter into agreements with their dealers, fixing and establishing the discounts to be allowed by such distributors, dealers and direct dealers on the sale of White parts and accessories to purchasers designated by White as National Accounts, Fleet Accounts, Federal and State Governments and departments and political subdivisions thereof, and the Court so finds.

### Retail Sales By Distributors

The Distributor Selling Agreements neither prohibit the sale of White trucks and parts by distributors to consumers nor require that distributors sell only to dealers, and since there are approximately 209 distributors but a total of only about 85 dealers (Plaintiff's Ex. 36), the Court finds that distributors sell White trucks, standard equipment, accessories and parts at retail to consumers as well as to dealers.

### Allocation of Territory

The Court further finds that:

All Distributor Selling Agreements provide that the distributors may sell White trucks to dealers approved by White for resale only within the distributor's assigned territory.

The agreements under consideration all contain agreements by the distributors, dealers and direct dealers not to sell White trucks except to individuals, firms or corporations having places of business and/or purchasing headquarters within the territories assigned in their respective contracts.

### Allocation of Customers

The Court further finds that:

All Distributor, Dealer and Direct Dealer Selling Agreements contain agreements by such distributors, dealers and direct dealers that they will not sell White trucks to any Federal or State government or any department or political subdivision thereof without permission of White.

All Distributor Selling Agreements contain agreements by such distributors that they will not authorize their dealers to sell White trucks to any Federal or State government or any department or political subdivision thereof without permission of White.

All Dealer Selling Agreements contain agreements by the dealers that they will not sell White trucks to any person, firm or corporation for resale without the written consent of their respective distributors.

All Distributor Selling Agreements contain agreements by such distributors that they will not authorize their dealers to sell trucks to any person, firm or corporation for resale without the written consent of White.

All White Distributor and Direct Dealer Selling Agreements contain agreements by the dealers that they will not sell White trucks to any person, firm or corporation for resale (excluding White, its branches, distributors, dealers and direct dealers approved by White) without the consent of defendant.

Certain of the contracts under consideration contain agreements by distributors, dealers or direct dealers that they will not sell White trucks to specific persons, firms or corporations.

### Motion for Summary Judgment

The Government contends its motion should be granted because the subject contracts and other admitted facts constitute restraints of interstate commerce which are *per se* unreasonable, and therefore, without more, are illegal. White opposes the motion on the grounds that the facts herein do not disclose restraints which are illegal *per se* and that it is entitled to introduce at trial other evidence which, it claims, would prove that its various distributor and dealer contracts do not unreasonably restrain trade.

Defendant herein has filed no opposing affidavits, exhibits or deposi-

tions but concessions made in an opposing party's brief may be considered in a motion for summary judgment. Allison v. Mackey, 1951, 88 U.S.App. D.C. 154, 188 F.2d 983; 6 Moore's Federal Practice, Second Ed., 2081.

Examples of the ultimate facts which defendant would seek to prove at trial are contained in the following excerpt from its Brief, pp. 4, 5:

" * * * the manufacture and sale of trucks is an extremely competitive business, a business as competitive as any business in the United States; that among the defendant's competitors are General Motors Corporation, Ford Motor Company, Chrysler Corporation and International Harvester Company, each much larger and more powerful than The White Motor Company, as well as Mack Trucks, Inc., a corporation about the same size as The White Motor Company; that the competition between the above mentioned truck companies, in fact, fixes the price at which trucks are sold to the consumers; that the provisions of the defendant's contracts, of which the plaintiff complains, do not in fact or in effect unreasonably restrain competition or trade and commerce in the manufacture and sale of trucks, but on the contrary increase such competition by enabling the defendant to have a distributing organization which enables it to compete effectively with its larger and more powerful competitors; that the use of distributors and dealers has been a common method of marketing trucks and other commodities for more than half a century; and that fair and reasonable protection for distributors and dealers is necessary, or the defendant will lose many competent distributors and dealers, thus reducing competition in the sale of trucks; and that the destruction of the class of small business men, known as distributors and dealers, is not to the public interest; and

many other facts that, we believe, will establish to the satisfaction of this Court that the contractual provisions, of which the plaintiff complains, have proper purposes and effects and are not unfair or unreasonable in any respect and that such provisions are not in unreasonable restraint of competition or trade and commerce within the inhibitions of the Sherman Antitrust Act."

■ Such considerations have no materiality to the issues presently before the Court, namely, whether the admitted facts disclose *per se* violations of the Sherman Act. For if, by "considering the contracts or agreements, their necessary effect and the character of the parties by whom they were made, they were clearly restraints of trade within the purview of the statute, they could not be taken out of that category by indulging in general reasoning as to the expediency or non-expediency of having made the contracts or the wisdom or want of wisdom of the statute which prohibited their being made." Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 65, 31 S.Ct. 502, 517, 55 L.Ed. 619.

There being no genuine issue as to any material fact upon which the Government relies, the motion for summary judgment may properly be decided on the basis of the pleadings, evidence and briefs now before the Court.

### Resale Price Maintenance

Fifty years ago in Dr. Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502, the Supreme Court held vertical resale price maintenance agreements to be violations of the Sherman Act. The case arose in this Circuit when a manufacturer of proprietary medicines established a system of contracts for the maintenance of prices fixed by it for wholesale and retail sales of its products and brought an action to enjoin a wholesale druggist, who had refused to enter into such an agreement, from buying

Dr. Miles products from others, in violation of their contracts, and then reselling them at cut prices. The Court held that the appellant was not entitled to relief and that the resale price agreements were illegal both at common law and under the Sherman Act. Appellant had urged the business importance of "a standard retail price" and that "confusion and damage have resulted from sales at less than the prices fixed." Id. 220 U.S. 407, 31 S.Ct. 384. But the Court held that a manufacturer's power "to project his control beyond his own sales must depend not upon an inherent power incident to production and original ownership, but upon agreement" (Id., 220 U.S. 405, 31 S.Ct. 384), that all restraints of trade and interference with liberty of action in trading were contrary to public policy unless the particular restriction could be shown to be reasonable "in reference to the interests of the parties concerned, and reasonable in reference to the interests of the public, * * * while at the same time it is in no way injurious to the public." Id., 220 U.S. 407, 31 S.Ct. 384. The Court stated that the case was "not analagous to that of a sale of good will, or of an interest in a business, or of the grant of a right to use a process of manufacture," for the manufacturer "has conferred no right by virtue of which [its] purchasers * * * may compete with it." Instead, the manufacturer "retains complete control over the business in which it is engaged, manufacturing what it pleases and fixing such prices for its own sales as it may desire." Id., 220 U.S. 407, 31 S.Ct. 384. The Court found that the agreements were "designed to maintain prices, after the complainant has parted with the title to the articles, and to prevent competition among those who trade in them." Id., 220 U.S. 407, 31 S.Ct. 384. It held that:

"* * * agreements or combinations between dealers, having for their sole purpose the destruction of competition and the fixing of prices, are injurious to the public interest and void. They are not saved by the advantages which the participants expect to derive from the enhanced price to the consumer. * *

"* * * The complainant having sold its product at prices satisfactory to itself, the public is entitled to whatever advantage may be derived from competition in the subsequent traffic." Id., 220 U.S. 408, 409, 31 S.Ct. 384.

In United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, the Court sustained the dismissal of an indictment which the District Court had interpreted as charging only that defendant had exercised its right to specify resale prices and to refuse to deal with anyone who refused to maintain them. In United States v. Schrader's Son, 1920, 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471, followed by Frey & Son v. Cudahy Packing Co., 1921, 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892, and F.T.C. v. Beech-Nut Packing Co., 1922, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, the Supreme Court expressly limited the Colgate doctrine and reaffirmed Dr. Miles as holding that combinations and conspiracies to fix resale prices and thereby "destroy the dealers' independent discretion" (252 U.S. at page 99, 40 S.Ct. at page 253) were illegal under the Sherman Act. The principles of the Dr. Miles case with respect to resale price maintenance have never been questioned by the Supreme Court and were recently reaffirmed in United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505, discussed below.

United States v. Bausch & Lomb Optical Co., 1944, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024, decided after the passage of the Miller-Tydings Act [2] presented issues similar to those in the instant case. It was a civil action charging

2. The provisos now contained in Section 1 of the Sherman Act (15 U.S.C.A. § 1), resulting from legislation known as the Miller-Tydings Act, exempt certain resale price maintenance agreements from the statute's operation.

Soft-Lite Lens Co. with violation of Sections 1 and 3 of the Sherman Act by establishing resale price maintenance agreements and certain distribution controls with respect to certain unpatented pink tinted eyeglass lenses bearing the trademark Soft-Lite, and of which Soft-Lite was the sole distributor. Soft-Lite had introduced pink tinted lenses in the United States and at times had engaged various manufacturers to produce these lenses which it would market. Eventually, Soft-Lite entered into an arrangement with one of these manufacturers, Bausch & Lomb, whereby the latter agreed to produce the tinted lenses exclusively for Soft-Lite, not to compete with Soft-Lite in the sale of such lenses, and not to manufacture them for others. United States v. Bausch & Lomb Optical Co., D.C.S.D.N.Y.1942, 45 F.Supp. 387, 390. As the business grew, Soft-Lite built up a distribution system which included the "licensing" of selected wholesalers who would adhere to its policies, including resale only to those retailers "licensed" by Soft-Lite at prices established by Soft-Lite. Retailers were carefully selected and were not expected to quote prices in their advertisements or operate as adjuncts to department or jewelry stores. The District Court found that while specific, uniform retail prices to consumers were not established by Soft-Lite, retailers were required to maintain prevailing local prices and to charge premium prices over comparable untinted lenses, consequently, retail prices were not freely allowed to find their own competitive levels. Retailers agreed with Soft-Lite to sell only to consumers or patients. Refusal of wholesalers or retailers to observe the sales and price policies established by Soft-Lite, or sales by wholesalers to retailers not approved by Soft-Lite, resulted in the offending wholesalers' or retailers' having their licenses from Soft-Lite cancelled, thus being no longer entitled to receive Soft-Lite lenses. In its advertising, Soft-Lite stressed that it was protecting its approved retailers from competition of "unethical practitioners and price cutters," and each participant knew he was a part of a larger system. 45 F.Supp. at pages 392, 393, 397.

The District Court concluded that Soft-Lite's distribution system was in violation of the letter and spirit of Sections 1 and 3 of the Sherman Act. Judge Rifkind said, at page 395:

"The principle has long been established that the Sherman Act condemns an agreement between a distributor and a group of wholesalers to boycott all retailers not approved by the distributor and to charge a uniform price to all retailers who are approved." (Citing cases.)

The District Court held that the exclusive manufacturing arrangement between Soft-Lite and Bausch & Lomb was not illegal and, the Supreme Court being equally divided on this issue, its dismissal of Bausch & Lomb was affirmed.

In the Supreme Court, when Soft-Lite admitted that its retail license provisions, binding dealers to sell (1) at locally prevailing prices and (2) only to the public, constituted illegal restraints, the Supreme Court said:

"Our former decisions compel this conclusion. Price fixing, reasonable or unreasonable, is 'unlawful *per se.*' (Citing cases.) The retailer's price to his customer is the single source of stable profits for all handlers." 321 U.S. at pages 719, 720, 64 S. Ct. at page 812.

The Court also held that Soft-Lite's agreements with its wholesalers to maintain prices and restrict customers violated Sections 1 and 3 of the Sherman Act:

"Soft-Lite is the distributor of an unpatented article. It sells to its wholesalers at prices satisfactory to itself. Beyond that point it may not project its power over the prices of its wholesale customers by agreement. A distributor of a trademark article may not lawfully limit by agreement, express or implied, the price at which or the persons to whom its purchaser may

resell, except as the seller moves along the route which is marked by the Miller-Tydings Act. Dr. Miles [Medical Co.] v. [John D.] Park [& Sons Co.], 220 U.S. 373, 404, [31 S.Ct. 376, 383, 55 L.Ed. 502]. Even the additional protection of a copyright, * * * or of a patent, * * * adds nothing to a distributor's power to control prices of resale by a purchaser. The same thing is true as to restriction of customers." Id., 321 U.S. 721, 64 S.Ct. 812.

And, at page 723 of 321 U.S., at page 813 of 64 S.Ct., the Court said:

"So far as the wholesalers are concerned, Soft-Lite and its officers conspired and combined among themselves and with at least some of the wholesalers to restrain commerce by designating selected wholesalers as sub-distributors of Soft-Lite products, by fixing resale prices and by limiting the customers of the wholesalers to those recommended by the wholesalers and approved by Soft-Lite—all in violation of the Sherman Act."

Recently, the Supreme Court had occasion to consider how far a manufacturer may go in regulating resale prices and distribution policies of its wholesalers and retailers. In United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505, a manufacturer of pharmaceuticals was charged with violation of Sections 1 and 3 of the Sherman Act by combining and conspiring with retail and wholesale druggists in Richmond, Va., and the District of Columbia to maintain wholesale and retail prices of its products in areas which had no "fair trade" laws.[3] Parke Davis sold to five wholesale druggists in the area involved and directly to some large retailers. Before 1956 Parke Davis had announced in its catalogues that it would deal only with wholesalers who adhered to Parke Davis's published resale price schedules and who, in turn, sold only to drug retailers authorized by law to fill prescriptions, and who observed Parke Davis's suggested minimum retail prices. When certain retailers began advertising and selling Parke Davis products at lower than the suggested minimum prices, Parke Davis called on its wholesale and retail customers in the area and announced it would refuse to sell to any retailer who did not observe its suggested minimum prices, and would refuse to sell to any wholesaler who resold to retailers who did not adhere to the minimum prices. Each whole-

3. "Fair trade laws" is a name frequently given to state statutes which permit resale price maintenance agreements. Such contracts, under certain conditions, are exempt from the provisions of the Sherman Act under the Miller-Tydings Act (note 2 above) and from the antitrust laws generally by the McGuire Act, passed in 1952. This Act amended 15 U.S.C.A. § 45(a), insofar as relevant here, to provide that:

"(2) Nothing contained in this section or in any of the Antitrust Acts shall render unlawful any contracts or agreements prescribing minimum or stipulated prices, or requiring a vendee to enter into contracts or agreements prescribing minimum or stipulated prices, for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale.

* * * * *

"(5) Nothing contained in paragraph (2) of this subsection shall make lawful contracts or agreements providing for the establishment or maintenance of minimum or stipulated resale prices on any commodity referred to in paragraph (2) of this subsection, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other."

saler and retailer was informed that his competitors were being similarly advised. Retailers who would give no assurances of compliance were cut off by Parke Davis, not only as to the branded products being sold below the specified minimum price but as to all Parke Davis's products including drugs used in filling prescriptions.

Failing in these efforts to prevent retail price cutting, Parke Davis next attempted, by means of personal calls on wholesalers and retailers, to induce the retailers to refrain only from advertising discount prices. This plan was successful for a short time, but soon Parke Davis abandoned all efforts to prevent cut-price advertising and selling.

At the close of the Government's case, the District Court had dismissed the action on the ground that Parke Davis's activities were properly unilateral and sanctioned by law under the doctrine of United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. The Supreme Court reversed, again reaffirming the Dr. Miles case and pointing out, as it has been required to do many times over the years, the narrowness of the Colgate doctrine. At page 44 of 362 U.S., at page 512 of 80 S.Ct., in discussing a manufacturer's unilateral refusal to deal with customers not adhering to its resale price policy, the Court said:

> "True, there results the same economic effect as is accomplished by a prohibited combination to suppress price competition if each customer, although induced to do so solely by a manufacturer's announced policy, independently decides to observe specified resale prices. So long as Colgate is not overruled, this result is tolerated but only when it is the consequence of a mere refusal to sell in the exercise of the manufacturer's right 'freely to exercise his own independent discretion as to parties with whom he will deal.' * * * When the manufacturer's actions, as here, go beyond mere announcement of his policy and the

simple refusal to deal, and he employs other means which effect adherence to his resale prices, this countervailing consideration is not present and therefore he has put together a combination in violation of the Sherman Act."

But, the Court said:

> "The program upon which Parke Davis embarked to promote general compliance with its suggested resale prices plainly exceeded the limitations of the Colgate doctrine and under Beech-Nut and Bausch & Lomb effected arrangements which violated the Sherman Act. Parke Davis did not content itself with announcing its policy regarding retail prices and following this with a simple refusal to have business relations with any retailers who disregarded that policy. Instead Parke Davis used the refusal to deal with the wholesalers in order to elicit their willingness to deny Parke Davis products to retailers and thereby help gain the retailers' adherence to its suggested minimum retail prices. The retailers who disregarded the price policy were promptly cut off when Parke Davis supplied the wholesalers with their names. The large retailer who said he would 'abide' by the price policy, the multi-unit Peoples Drug chain, was not cut off. In thus involving the wholesalers to stop the flow of Parke Davis products to the retailers, thereby inducing retailers' adherence to its suggested retail prices, Parke Davis created a combination with the retailers and the wholesalers to maintain retail prices and violated the Sherman Act." Id., 362 U.S. 45, 80 S.Ct. 512.

The Court noted that if the "resumed adherence" of one of Parke Davis's retail customers to the Parke Davis price schedule, following the interview between the customer's Vice President and Parke Davis's Assistant Branch Manager, showed that the two had entered into a price maintenance agreement "express,

tacit, or implied, such agreement violated the Sherman Act without regard to any wholesalers' participation." Id., 362 U.S. 45 note 6, 80 S.Ct. 512.

White admits that certain of its resale prices are fixed but urges that such agreements have two limited applications which, in its view, have "proper purposes and effects":

"One is that if a distributor exercises his option to appoint dealers under him he must sell new White trucks to his dealers at the same prices as the prices at which The White Motor Company sells such new White trucks to its direct dealers. The purpose of this provision is to assure the defendant that the distributors' dealers and the defendant's direct dealers get an equal break pricewise. This is both fair and necessary if the defendant and its distributors are to have satisfied and efficient dealer organizations. It would be intolerable to have the defendant's direct dealers buying trucks at one price and the distributors' dealers buying the same trucks at a different price. The other very limited situation is that all distributors and dealers must give to 'national accounts', 'fleet account', and Federal and State governments and departments and political subdivisions thereof the same discounts on parts and accessories as the defendant gives to said 'national accounts', 'fleet accounts' and Federal and State governments and departments and political subdivisions thereof. The purpose of this provision is so that the defendant may be assured that 'national accounts', 'fleet accounts' and Federal and State governments and departments and political subdivisions thereof, which are classes of customers with respect to which the defendant is in especially severe competition with the manufacturers of other makes of trucks and which are likely to have a continuing volume of orders to place, shall not be deprived of their appropriate discounts on their purchases of repair parts and accessories from any distributor or dealer, with the result of becoming discontented with The White Motor Company and the treatment they receive with reference to the prices of repair parts and accessories for White trucks. It is common knowledge that probably nothing will make the owner of a motor vehicle so peeved as to be overcharged for repair parts and accessories." Defendant's Brief, pp. 54, 55.

■ The prohibitions of the Sherman Act cannot be evaded by good motives. Standard Sanitary Mfg. Co. v. United States, 1912, 226 U.S. 20, 49, 33 S.Ct. 9, 57 L.Ed. 107; Fashion Originators' Guild of America v. F. T. C., 1941, 312 U.S. 457, 468, 668, 61 S.Ct. 703, 85 L.Ed. 949; Associated Press v. United States, 1945, 326 U.S. 1, 16 note 15, 65 S.Ct. 1416, 89 L.Ed. 2013; Radovich v. National Football League, 1957, 352 U.S. 445, 453 note 10, 77 S.Ct. 390, 1 L.Ed.2d 456.

■ Nor are combinations fixing maximum prices any less subject to the Sherman Act than those which fix minimum prices for they "cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219.

Defendant, as well as its competitors, must comply with the law. Defendant established its distribution system, and if weaknesses or "intolerable" situations develop, it is within its power to make necessary corrections or revisions in the system within the framework of the law.

Defendant states that there are no provisions in its contracts "with reference to the prices that the purchasing public shall pay for White trucks," that "the provisions governing the prices that

distributors shall charge their dealers for trucks apply to less than 5 per cent of the trucks purchased by the distributors from The White Motor Company," and that "whatever restraints these limited provisions with regard to prices cause to competition or trade and commerce are trivial, theoretical and reasonable." (Defendant's Brief, pp. 55, 56.)

■ Volume of commerce is immaterial in Sherman Act cases. United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 221, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. McKesson & Robbins, 1956, 351 U.S. 305, 310, 76 S.Ct. 937, 100 L.Ed. 1209. It "is enough if some appreciable part of interstate commerce is the subject of a monopoly, a restraint or a conspiracy. * * * Likewise irrelevant is the importance of the interstate commerce affected in relation to the entire amount of that type of commerce in the United States." United States v. Yellow Cab Co., 1947, 332 U.S. 218, 225, 226, 67 S.Ct. 1560, 1564, 91 L. Ed. 2010.

That the contracts contain no provisions with reference to the specific prices which distributors, dealers or direct dealers shall charge consumers for White trucks has no bearing on the fact that wholesale truck and parts prices and parts prices to certain consumers are fixed by White.

While the defendant has not suggested that the resale price maintenance provisions under consideration fall within the Miller-Tydings or McGuire Act exemptions, it should be noted that the Supreme Court has held that a manufacturer which also acts as a wholesaler is not within those exemptions and therefore may not lawfully enter into resale price maintenance agreements with other wholesalers. United States v. McKesson & Robbins, 1956, 351 U.S. 305, 312, 76 S.Ct. 937, 100 L.Ed. 1209.

Defendant concedes (Brief, p. 57) that this case does not involve any issue either of sales through bona fide agents of the manufacturer or of products manufactured or sold under patent licenses as in United States v. General Electric Co., 1926, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. (See also provisions of contracts to the effect that distributors, dealers and direct dealers are not White's agents.)

■ In the Court's judgment, the provisions of defendant's distributor, dealer and direct dealer selling agreements, which prescribe resale prices and discounts of White trucks, equipment, accessories and parts, or any of them, constitute *per se* violations of Section 1 of the Sherman Act.

Allocation of Territories and Customers

■ The Government contends that since combinations and agreements fixing prices among competitors, which eliminate but a single element of competition, are illegal *per se,* the allocation of territories and of customers must also be illegal *per se,* as all elements of competition among the various selling units involved are thereby eliminated. (Government's Brief, p. 12.)

White's position is that, in order to market its trucks effectively in competition with the trucks of its competitors, it enters into contracts whereby its distributors agree to maintain sales rooms with stocks adequate to sell and service White trucks in their assigned territories, to properly display signs, and maintain adequate supplies of parts, and that the "territorial limitations do, in fact, not unreasonably or substantially restrict competition or trade and commerce but have both the purpose and effect of promoting the business and increasing the sales of White trucks in competition with The White Motor Company's powerful competitors." (Defendant's Brief, pp. 9, 10).

White urges that to obtain distributors or dealers who are "able and energetic," they must "have the agreement of The White Motor Company that it will not itself step in and undercut [them] and that The White Motor Company will not allow any other of its dis-

tributors or dealers to come into the territory and scalp the market for White trucks therein." White further states:

"To obtain the maximum number of sales of trucks in a given area, The White Motor Company has to insist that its distributors and dealers concentrate on trying to take sales away from other competing truck manufacturers in their respective territories rather than on cutting each other's throats in other territories. If The White Motor Company is unable to procure the kind of vigorous and reputable distributors and dealers that will adequately represent it in their respective areas, its distributing organization of distributors and dealers will, slowly but surely, deteriorate and disintegrate, and as surely as the retirement of The White Motor Company from business would reduce competition in the manufacture and sale of trucks, so, just as surely, would the deterioration and disintegration of The White Motor Company's distributing organization reduce competition in the manufacture and sale of trucks. The plain fact is, as we expect to be able to show to the satisfaction of the Court at a trial of this case on the merits, that the outlawing of exclusive distributorships and dealerships in specified territories would reduce competition in the sale of motor trucks and not foster such competition."

The terms "exclusive contracts," "exclusive territories," or "exclusive dealerships," frequently are used to mean (1) agreements by a manufacturer with its distributors or dealers that the manufacturer will not sell to any others or to others within their respective "exclusive territories," or (2) (as in this case) agreements by distributors and dealers with their manufacturer or supplier that they will not sell to purchasers located outside their respective assigned "exclusive territories." It is most im-

portant to keep in mind these conflicting definitions because agreements in the first category have been upheld as reasonable when ancillary to the sale of goods for resale because they protect the vendee's property rights in his resale business from being destroyed or damaged by the actions of his vendor who is in a position to undersell, or establish a competitor of, his vendee. United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024; United States v. Paramount Pictures, D.C.S.D. N.Y.1946, 66 F.Supp. 323, judgment modified 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260; Schwing Motor Co. v. Hudson Sales Co., 4 Cir., 1956, 239 F.2d 176; Packard Motor Car Co. v. Webster Motor Car Co., 1957, 100 U.S.App.D.C. 161, 243 F.2d 418.

But the Supreme Court has consistently held that agreements in the second category, allocation of markets among competitors, violate the Sherman Act. Since this case involves only agreements in the second category, we should first consider United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271, 46 L.R.A. 122, judgment affirmed, decree modified, Addyston Pipe & Steel Co. v. United States, 1899, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136. In that case, a number of manufacturers of cast iron pipe agreed to eliminate competition among themselves. This was accomplished in part by allocating business in certain cities or areas to specific manufacturers. Where several bids were required, as in the case of sales to Government agencies, the defendants agreed among themselves which company would be the low bidder. The trial court sustained defendants' demurrer but the Circuit Court of Appeals, in an opinion by Judge Taft, reversed and ordered a permanent injunction against the combination. Defendants admitted the existence of the agreements but claimed that they were necessary to avoid great losses and ruinous competition which would have carried prices far below a reasonable point. In language peculiarly applicable

to this case the Supreme Court asked and answered several questions:

"If dealers in any commodity agreed among themselves that any particular territory bounded by state lines should be furnished with such commodity by certain members only of the combination, and the others would abstain from business in that territory, would not such agreement be regarded as one in restraint of interstate trade? If the price of the commodity were thereby enhanced, (as it naturally would be,) the character of the agreement would be still more clearly one in restraint of trade. Is there any substantial difference where, by agreement among themselves, the parties choose one of their number to make a bid for the supply of the pipe for delivery in another State, and agree that all the other bids shall be for a larger sum, thus practically restricting all but the member agreed upon from any attempt to supply the demand for the pipe or to enter into competition for the business? Does not an agreement or combination of that kind restrain interstate trade, and when Congress has acted by the passage of a statute like the one under consideration, does not such a contract clearly violate that statute?" Id. 175 U.S. 241, 20 S.Ct. 107.

The Court went on to hold that the contract and combination violated the statute.

In Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 497, 60 S.Ct. 982, 994, 84 L.Ed. 1311, Justice Stone, discussing the relation of the Sherman Act to the common law concepts of restraints of trade, noted that agreements to "divide marketing territories [and] apportion customers," along with agreements to fix prices and restrict production, were "illegal and were unenforcible at common law." And, at page 493 of 310 U.S., at page 992 of 60 S.Ct.:

"The end sought [by enactment of the Sherman Act] was the preven-

tion of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury."

United States v. National Lead Co., D. C.S.D.N.Y.1945, 63 F.Supp. 513, affirmed 1947, 332 U.S. 319, 67 S.Ct. 1634, 91 L. Ed. 2077, involved a world-wide cartel controlling patents and technological information pertaining to the manufacture of titanium compounds. In maintaining and carrying out the purpose of the cartel, to suppress competition among its members, the parties allocated territories among themselves and refused to license potential customers or classes of customers under the patents except on terms agreed upon by the combination. Of this the District Court said, at page 524 of 63 F.Supp.:

"This is a case where if not the sole, at least one of the principal, objects was 'to restrain trade in order to avoid the competition which it has always been the policy of the common law to foster.' United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271, 282, 283; * * *."

And, at page 523:

"No citation of authority is any longer necessary to support the proposition that a combination of competitors, which by agreement divides the world .into exclusive trade areas, and suppresses all competition among the members of the combination, offends the Sherman Act."

In United States v. Imperial Chemical Industries, D.C.S.D.N.Y.1951, 100 F. Supp. 504, at pages 592, 593, after finding that the defendants had conspired to avoid and prevent competition among themselves and with others by dividing markets in restraint of interstate and foreign commerce, the Court said:

"In the face of this finding, the law is crystal clear: A conspiracy to divide territories, which affects American commerce, violates the Sherman Act.

\* \* \* \* \* \*

"Territorial division is 'in restraint of trade or commerce,' no less than price fixing. It involves 'the denial to commerce of the supposed protection of competition.' United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 428. There is no intimation in any decision that elimination of competition is to be given a more favorable judicial consideration when achieved by the route of territorial division rather than by way of price fixing, or that proof of industry domination is required in one case though not required in the other."

Defendant has cited a number of cases which are claimed to stand for the proposition that a manufacturer's agreements with its distributors or dealers which restrict their sales territories are lawful.

The first of these cases, Phillips v. Iola Portland Cement Co., 8 Cir., 1903, 125 F. 593, certiorari denied 1904, 192 U.S. 606, 24 S.Ct. 850, 48 L.Ed. 585, involved a single sale of cement which the defendant jobber had agreed not to ship or sell outside the State of Texas. Sued for breach of contract in refusing to accept and pay for some of the cement, defendant alleged that the agreement violated the Sherman Act and was therefore unenforceable. The agreement was held not to have had any direct or substantial effect upon competition or trade among the states, that other manufacturers competing with plaintiff were free to set their own prices and select their customers, and that, if the agreement did have the effect of restraining defendant from competing with other jobbers and manufacturers beyond the State of Texas, "this restriction was not the chief purpose or the main effect of the contract of sale, but a mere indirect and immaterial incident of it." Id. 125 F. 595.

Phillips obviously has no bearing on the instant case which is a direct attack on a system of restraints which are in continual operation, not an action for breach of a single contract of sale.

Cole Motor Car Co. v. Hurst, 5 Cir., 1915, 228 F. 280, certiorari denied Tillar v. Cole Motor Car Co., 1918, 247 U.S. 511, 38 S.Ct. 579, 62 L.Ed. 1242, involved an agent or consignee of the plaintiff automobile manufacturer being sued for money due. The consignee defended on the ground that the contract was illegal in that it restricted the territory in which he could sell. The antitrust question was raised collaterally and involved only the relationship between a manufacturer and a single outlet. Moreover, while White quoted extensively from the Cole opinion, at pages 12 and 13 of its brief, it omitted from the context the following two sentences showing that the relationship between the parties was that of principal and agent, not buyer and seller, making the case clearly inapplicable to White:

"It will be seen that it was not a contract which conveyed title to Hurst, and brought his control of the machines under the operation of the Texas law. Surely the Cole Company had the right to determine that its agents should sell its cars at its own price." Id. 228 F. 284.

Sinclair Refining Co. v. Wilson Gas and Oil Co., D.C.W.D.S.C.1931, 52 F.2d 974, was also a suit for goods sold. The Court rejected and did not consider a counterclaim based on conduct of defendant which allegedly violated the Sherman Act.

The Federal Trade Commission cases cited by defendant, B. S. Pearsall Butter Co. v. F. T. C., 7 Cir., 1923, 292 F. 720 and General Cigar Co., Inc., 16 FTC, dec. 537 (1932), do not bear on the issues of this case.

Another Commission ruling cited by defendant is Columbus Coated Fabrics Corp., CCH Trade Reg.Rep., 1959–60, p. 36,963, a proceeding under Section 5 of

the Federal Trade Commission Act (15 U.S.C.A. § 45). The complaint charged a manufacturer and two of its distributors with conspiring to restrain competition by:

"(1) Establishing and maintaining uniform fixed suggested dealer resale prices;

"(2) Establishing and maintaining exclusive sales territories for distributors;

"(3) Threatening to, and boycotting certain dealers." (Id. 36,963.)

The hearing examiner dismissed charges 1 and 2 above but entered a cease and desist order as to charge 3. The dismissal of charges 1 and 2 resulted from finding that there were no agreements embracing such terms, not upon a conclusion that such agreements would be lawful as would be inferred from defendant's brief. Chairman Gwynne, speaking for the Commission, stated, at page 36,964:

"There is no evidence of any agreement, either written or oral, as to these allocations. Nor is there any substantial evidence that Columbus made efforts to require observance or to police the unilateral arrangements it made. * * * It appears also that any distributor or dealer may sell Wall-Tex anywhere he wishes. He can also choose his own customers and is free to handle competing products. In fact, many do handle such products.

\* \* \* \* \* \*

"There is no evidence of any agreement between distributors to enforce Columbus' suggested prices or to enforce their own. Nor is there evidence of agreement among dealers to agree to or to enforce either."

United States v. Paramount Pictures, D.C.S.D.N.Y.1946, 66 F.Supp. 323, judgment modified 1948, 334 U.S. 131, 68 S. Ct. 915, 92 L.Ed. 1260, involved an issue of the *per se* illegality of agreements (called "clearances") by motion picture distributors with exhibitors not to license other exhibitors in their respective territories to show certain films until after the lapse of specified numbers of days. This case involved restrictions of a different nature from the one at bar, for, as the three-judge District Court held, the granting of clearances when "not accompanied by a fixing of minimum prices or not unduly extended as to area or duration, affords a fair protection to the interests of the licensee without unreasonably interfering with the interests of the public." Id. 66 F.Supp. 341.

Boro Hall Corp. v. General Motors Corp., 2 Cir., 1942, 124 F.2d 822, rehearing denied 130 F.2d 196, certiorari denied 1943, 317 U.S. 695, 63 S.Ct. 436, 87 L.Ed. 556, involved the issue of an automobile manufacturer's requiring that one of its dealers not locate its used car sales outlet except in an area to be agreed upon between the parties, so as not to unduly prejudice other dealers of that manufacturer and distributor. The Court of Appeals affirmed the dismissal of the cause of action as not stating a claim under the Sherman Act. The agreement, or proposed agreement, at issue in Boro Hall related only to the location of a place of business and, as the Court noted:

"The plaintiff was always at liberty to sell used cars outside of its 'zone of influence' and was only forbidden to establish a used car outlet, lot or salesroom outside this zone." Id. 130 F.2d 197.

Defendant also relies on Schwing Motor Co. v. Hudson Sales Co., D.C.Md. 1956, 138 F.Supp. 899, affirmed *per curiam* 4 Cir., 1956, 239 F.2d 176, and Packard Motor Car Co. v. Webster Motor Car Co., 1957, 100 U.S.App.D.C. 161, 243 F.2d 418. Both were treble damage actions under Sections 1 and 2 of the Sherman Act but neither involved issues other than refusal to deal. The Schwing case was instituted by two former Hudson automobile dealers who charged that the manufacturer entered into an agreement with a third dealer whereby the manufacturer refused to renew plaintiffs' dealer franchises and refused to sell them Hud-

son automobiles, thus giving the third dealer a "virtual monopoly" of the sale of Hudson automobiles and parts in the City of Baltimore. On motion of defendants, the amended complaint was dismissed. The Court held that the defendant manufacturer was within its rights in exercising discretion as to the parties with whom it wished to deal, citing the Colgate case, and others:

> "A manufacturer may prefer to deal with one person rather than another, and may grant exclusive contracts in a particular territory." 138 F.Supp. 903.

The Court, in Schwing, recognized that there had been no allegation of a "horizontal conspiracy between competitors" (Id. 138 F.Supp. 905), and commented that if such had been the case "[o]f course the agreement would be invalid * * *." Id. 906.

The Packard case was brought by a former Baltimore Packard automobile dealer against the manufacturer and two of its officers, charging that Packard had agreed with another dealer, Zell, to terminate the franchises of all other Packard dealers in Baltimore to give Zell an exclusive contract for that area. The District Court submitted the case to the jury, which returned a verdict for the plaintiff. The Court of Appeals reversed, expressing agreement with the Schwing decision, above, and holding that the "fact that any other dealers in the same product of the same manufacturer are eliminated does not make an exclusive dealership illegal; it is the essential nature of the arrangement. The fact that Zell asked for the arrangement does not make it illegal." 243 F.2d 421. It is apparent that the "exclusive contracts" and "exclusive dealerships" in Schwing and Packard are contracts in which the vendors (in those cases the manufacturers) agreed with certain of their respective dealers that they would not sell to others or appoint other dealers or agents within specified areas or distances in relation to the dealers' places of business but that those terms do not apply to the agreements at issue in the instant case whereby vendees (distributors and dealers) agree with their vendors (manufacturer or distributors) not to resell goods purchased to certain classes of customers or outside of their assigned territories.

Reliable Volkswagen Sales and Service Co. v. Worldwide-Automobile Corp., D. C.N.J.1960, 182 F.Supp. 412, charged breach of contract, fraud and other wrongful acts including violation of the Sherman Act. Plaintiff alleged that a foreign manufacturer, its exclusive United States importer, and others, agreed among themselves and with other distributors to sell Volkswagen products only to franchised Volkswagen dealers; that the defendants agreed to limit sales to franchised dealers within the respective exclusive sales territories of the distributors, and that as a result of these agreements plaintiff has been unable to purchase Volkswagen products. The case was before the District Court on defendants' motion to dismiss or for summary judgment. The Court dismissed the eighth cause of action, which had set forth the above Sherman Act allegations. Defendant herein emphasizes Circuit Judge Forman's comment that he was "not persuaded that this system constitutes a *per se* violation of * * * the Sherman Act." Id. 427.

In dismissing the charge, the Court relied, to some extent, on the Schwing and Packard cases (discussed above and found to be inapplicable to the instant case) and on United States v. Bitz, D.C. S.D.N.Y.1959, 179 F.Supp. 80, which decision was later reversed. United States v. Bitz, 2 Cir., 1960, 282 F.2d 465. But the real basis for the Court's dismissal of the eighth cause of action in Reliable Volkswagen appears to have been not upon a consideration of the legality of defendants' distribution system, but upon its conclusion that the cause of action failed to allege a public injury or "even a private injury," 182 F.Supp. 425, and that it alleged "only a refusal to deal for which in this context the antitrust

law provides no remedy." Id. 427. Since this construction made dismissal mandatory under the Colgate doctrine, the case has no application to White.

For the reasons indicated, defendant's authorities do not sustain the legality of the territorial allocations of its marketing system.

White defends the agreements of its distributors, dealers and direct dealers not to sell to anyone for resale (except to White or other White approved distributors and dealers) as being necessary to "assure itself by the provisions of its contracts that the persons attempting to sell White trucks to the purchasing public shall be men who will deal honestly and fairly with the purchasing public; * * *." (Defendant's Brief, p. 36.)

The provisions of its selling agreements prohibiting distributors, dealers and direct dealers from selling White trucks to Federal or State Governments, or departments or political subdivisions thereof, are justifiable, according to White, because they do not "restrict the competition for government business but on the contrary increase[s] such competition by enabling The White Motor Company to compete for the business on equal terms with, and under as favorable circumstances as, competing manufacturers of trucks." (Defendant's Brief, p. 37.)

The cases cited by defendant, as supporting customer allocation, either involved single contracts or did not present Sherman Act issues and therefore have no bearing on this case.

Wilder Mfg. Co. v. Corn Products Refining Co., 1915, 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520, was an action for goods sold, which started in the State Courts of Georgia. The purchaser, Wilder, defended on the ground that plaintiff corporation was organized to violate the federal antitrust laws, hence had no legal existence, and that the purchase contract was unenforceable because of a clause to the effect that the goods sold were for defendant's own use and not for resale.

The trial court struck out the answer as constituting no defense, the Georgia Court of Appeals affirming. The Supreme Court held that the contract of sale was not inherently illegal because of that clause, and others, so as to bar recovery for the purchase price. There was no issue, and no expression of opinion by the Court, as to whether the resale restrictions constituted a violation of Section 1 of the Sherman Act.

In Green v. Electric Vacuum Cleaner Co., 6 Cir., 1942, 132 F.2d 312, plaintiff manufacturer brought an action for patent and trademark infringement against a rebuilder of vacuum cleaners. As a defense it was asserted that plaintiff was violating the antitrust laws in attempting to prevent defendant from obtaining its parts. Affirming judgment for the plaintiff, the Court held that directives by the plaintiff to its dealers not to resell its patented parts to persons engaged in rebuilding traded-in or junked cleaners were not contracts in unreasonable restraint of trade under the antitrust laws.

P. Lorillard Co. v. Weingarden, D.C. W.D.N.Y.1922, 280 F. 238, involved a single transaction wherein plaintiff sought to enforce a restrictive covenant against sale within the United States of a quantity of cigarettes sold to defendant at a special price because of their inferior quality. Plaintiff contended that their sale in this country would damage its reputation. The Court held the covenant to be reasonable and that it presented no question of Sherman Act violation.

Fosburgh v. California & Hawaiian Sugar Refining Co., 9 Cir., 1923, 291 F. 29, also involved a single transaction wherein the Court held to be reasonable, and not in violation of the Sherman Act, contractual provisions enjoining the resale of certain sugar purchased, where such provisions had been made at the suggestion of the United States Government because of the World War I sugar shortage.

In United States v. Newbury Manufacturing Co., D.C.D.Mass.1941, 36 F.Supp.

602, the Court held to be reasonable a restriction by a vendor, the United States Government, to the effect that certain goods sold be disposed of only in foreign countries.

Chicago Sugar Co. v. American Sugar Refining Co., 7 Cir., 1949, 176 F.2d 1, certiorari denied 1950, 338 U.S. 948, 70 S.Ct. 486, 94 L.Ed. 584, was an action instituted by a sugar distributor against a processor under the Clayton Act and the Robinson Patman Act. The Court held that long term requirements contracts between a sugar refiner and a manufacturer, whereby the manufacturer agreed to use the sugar solely for its own purposes and not to resell it, was not harmful to competition or in restraint of trade. No Sherman Act question was involved.

In Bascom Launder Corp. v. Telecoin Corp., 2 Cir., 1953, 204 F.2d 331, certiorari denied 1953, 345 U.S. 994, 73 S.Ct. 1133, 97 L.Ed. 1401, the issue was over an instruction given by the District Judge to the jury in a treble damage action. He had stated that a contract whereby a manufacturer appointed a single distributor to sell to a certain class of customers, and agreed to appoint no other, "amounted to a contract, combination and conspiracy in restraint of trade or commerce in violation of the Sherman Act as a matter of law." Id. 204 F.2d 334. The Court of Appeals reversed, holding that the instruction had amounted to a directed verdict for the plaintiff, whereas the question was for the jury to decide.

Roux Distributing Co., Federal Trade Commission Dkt. 6636, CCH Trade Reg. Rep. (FTC Complaints, Orders, Stipulations, 1959–1960), par. 27,855, p. 36,923, was a decision by the Commission arising out of an action under Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45. Respondent was charged with requiring its wholesale customers to agree to limit their sales to certain classes of purchasers. The statute condemns unfair methods of competition and unfair or deceptive acts or practices in commerce. The Commission held that "a violation of Section 5 is not shown unless the record contains some evidence of the competitive effect of the practices," (Id. 36,925), and dismissed the complaint after finding no conclusive evidence of previous competition among respondent's customers, which the challenged agreements allegedly had removed. No issues involving the Sherman Act were presented.

 White asserts that it does not dominate the truck market and that "the relevant market is not a market for White trucks, as plaintiff seems to assume in its brief, but is the market for trucks of all makes," (Defendant's Brief, p. 70), citing United States v. E. I. Du Pont De Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264. But Du Pont was an action under Section 2 of the Sherman Act charging monopolization or attempts to monopolize which necessarily involved questions of relevant market. On the other hand, Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024; United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209; United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505, to cite but a few cases, make it abundantly clear that market control is not a material factor in cases involving resale restrictions and that resellers of identical products of a single manufacturer are regarded as being in competition with one another with respect to such sales. See also United States v. Bausch & Lomb Optical Co., D.C.S.D.N.Y.1942, 45 F.Supp. 387, 397.

 White's defense is based on the assumption that a process of justification may be employed to remove from the scope of the Sherman Act restraints which, by their inherent nature, have a direct and immediate effect upon interstate commerce. This theory was dis-

cussed at length and rejected in Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, wherein the Court held that a finding that a contract or combination in restraint of trade has a direct and immediate effect on interstate commerce, and the application of the rule of reason, were one and the same thing. It stated, at page 67 of 221 U.S., at page 518 of 31 S.Ct.:

"The confusion which gives rise to the question results from failing to distinguish between the want of power to take a case which, by its terms or the circumstances which surrounded it, considering among such circumstances the character of the parties, is plainly within the statute, out of the operation of the statute by resort to reason in effect to establish that the contract ought not to be treated as within the statute, and the duty in every case where it becomes necessary from the nature and character of the parties to decide whether it was within the statute, to pass upon that question by the light of reason."

█ Individually, White and any of its distributors, dealers or direct dealers might refuse to sell to certain customers or classes of customers but the Sherman Act makes concerted refusal to deal, as in this case, an offense. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219.

## Conclusion

█ The Sherman Act does not sanction the suppression by a manufacturer of competition among its purchasers or subpurchasers, Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 452, 60 S.Ct. 618, 84 L.Ed. 852; nor does it permit limitation on sales to certain customers or classes of customers by vertical combination, Dr. Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 400, 31 S.Ct. 376, 55 L.Ed. 502; United States v. Bausch & Lomb

Optical Co., 1944, 321 U.S. 707, 723, 64 S.Ct. 805, 88 L.Ed. 1024; especially when part of a scheme to fix or maintain resale prices, United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 44, 45, 80 S.Ct. 503, 4 L.Ed.2d 505. White can fare no better in a system of identical contracts with its distributors and dealers allocating territories and customers than could the distributors and dealers themselves "if they formed a combination and endeavored to establish the same restrictions, and thus to achieve the same result, by agreement with each other." Dr. Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 408, 31 S.Ct. 376, 384, 55 L.Ed. 502.

In Associated Press v. United States, 1945, 326 U.S. 1, 15, 65 S.Ct. 1416, 1422, 89 L.Ed. 2013, the Supreme Court said:

"While it is true in a very general sense that one can dispose of his property as he pleases, he cannot 'go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade.' United States v. Bausch & Lomb [Optical] Co., 321 U.S. 707, 722 [64 S.Ct. 805, [813] 88 L.Ed. 1024]. The Sherman Act was specifically intended to prohibit independent businesses from becoming 'associates' in a common plan which is bound to reduce their competitor's opportunity to buy or sell the things in which the groups compete."

█ Within legal limits, White may contract with its distributors, dealers or other customers with respect to the maintenance of certain standards and policies. Also, within legal limits, White may simply announce its policies regarding its customers' resale practices and terminate its business dealings with those who do not comply. United States v. Colgate & Co., 1918, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992; United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 44, 80 S.Ct. 503, 4 L.Ed.2d 505. But the contractual

provisions at issue in this case do not relate to such matters as pertain only to White's distributors' and dealers' good will in the community, location and appearance of show rooms, maintenance of adequate repair and service facilities, employment of courteous and skilled technical and sales personnel, compliance with local laws and regulations, maintenance of good credit ratings, or assumption of primary responsibility for sales coverage of specified areas and classes of customers. At issue here is a system of agreements involving White and all distributors, dealers and direct dealers, in its nation-wide distribution system, which limit and suppress competition by fixing certain resale prices of White trucks and parts and by dividing markets, customers and classes of customers, including agreements which allow only White to bid on sales of trucks to Federal, State and local governmental agencies.

In John D. Park & Sons Co. v. Hartman, 6 Cir., 1907, 153 F. 24, 42, 12 L.R.A.,N.S., 135, appeal dismissed 212 U.S. 588, 29 S.Ct. 689, 53 L.Ed. 662, Circuit Judge (later Mr. Justice) Lurton aptly described the effects of a system of illegal resale restrictions imposed by a manufacturer, resembling those in the instant case, in the following manner:

"Thus all room for competition between retailers, who supply the public, is made impossible. If these contracts leave any room at any point of the line for the usual play of competition between the dealers in the product marketed by complainant [the manufacturer], it is not discoverable. Thus a combination between the manufacturer, the wholesalers, and the retailers to maintain prices and stifle competition has been brought about."

The foregoing passage was quoted with approval by the Supreme Court in Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, at page 400, 31 S.Ct. 376, 55 L.Ed. 502.

The Supreme Court, in United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, at pages 221, 222, 60 S.Ct. 811, at page 843, 84 L.Ed. 1129, condemned all price tampering conspiracies as violating the Sherman Act.

"Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination. If such a shift is to be made, it must be done by the Congress."

The subject provisions of defendant's selling agreements deprive purchasers or consumers, including all Federal, State and local governments, "of the advantages which they derive from free competition," Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 501, 60 S.Ct. 982, 996, 84 L.Ed. 1311, in the field of medium and heavy duty trucks in the United States and the District of Columbia, not only by eliminating competition among White's own distributors, dealers and direct dealers, but also by restraining and preventing their competing with, or bidding against, other truck manufacturers, and their respective distributors and dealers, outside their assigned sales areas.

On the basis of the facts found herein, as to which there is no genuine issue, the

Court is of the opinion that the plain purpose and effect of the challenged provisions of White's selling agreements is to eliminate and suppress competition by fixing certain resale prices of White trucks and parts, by allocating customers and by dividing sales territories among competitors or potential competitors; that the contracts containing such provisions directly affect interstate commerce and, as a matter of law under the authorities cited and discussed above, constitute contracts and combinations which, on their face, unreasonably restrain trade and commerce among the several states of the United States and the District of Columbia, in violation of Sections 1 and 3 of the Sherman Act. Accordingly, the Government's motion for summary judgment will be sustained and the Court will issue an appropriate decree.

 Entry of summary judgment in an antitrust case is both proper and desirable where the restraints complained of are clearly unreasonable, involving *per se* violations of the Sherman Act. Associated Press v. United States, 326 U.S. 1, 5, 6, 65 S.Ct. 1416, 89 L.Ed. 2013; International Salt Co. v. United States, 1947, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20. In sustaining the District Court's granting of summary judgment for the Government in Northern Pacific Railway Co. v. United States, 1958, 356 U.S. 1, at pages 4 and 5, 78 S.Ct. 514, at page 517, 2 L.Ed.2d 545, the Supreme Court said:

"The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. And to this end it prohibits 'Every contract, combination * * * or conspiracy, in restraint of trade or commerce among the several States.' Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which 'unreasonably' restrain competition. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1 [31 S.Ct. 502, 55 L.Ed. 619]; Chicago Board of Trade v. United States, 246 U.S. 231 [38 S.Ct. 242, 62 L.Ed. 683].

"However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210 [60 S.Ct. 811, [838] 84 L.Ed. 1129]; division of markets, United States v. Addyston Pipe & Steel Co. [6 Cir.], 85 F. 271, [46 L.R.A. 122], aff[irmed] 175 U.S. 211 [20 S.Ct. 96, 44 L.Ed. 136]; group boycotts, Fashion Originators' Guild [of

America] v. Federal Trade Com'n, 312 U.S. 457 [668] [61 S.Ct. 703, 85 L.Ed. 949]; and tying arrangements, International Salt Co. v. United States, 332 U.S. 392 [68 S.Ct. 12, 92 L.Ed. 20]."

See also Eastern Railroad Presidents Conference v. Noerr Motor Freight, 1961, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed. 2d 464.

There is nothing in the record to indicate that the defendant herein had any sinister motives in executing and maintaining the contractual provisions which the Court has determined to be unlawful on the basis of well established authority. Again referring to United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at page 222, 60 S.Ct. at page 843 (page 586 of this memorandum), defendant's arguments as to the business necessity of agreements of this type must be addressed to the Congress rather than to the Courts.

The traditional function of the trial Court is to interpret and apply the law, rather than to declare the law. Thus, it may frequently occur that a judge is required to render a decision that does not necessarily reflect his personal attitude or philosophy upon the subject. Upon the basis of the foregoing careful analysis and findings of fact as to which there is no genuine issue and the conclusions of law herein contained, my function as a judge is properly performed.

The Government will submit a proposed decree.

## Appendix A

### Annual Sales of White Trucks by Defendant

| Classes of Customers | 1955 Amount | 1956 Amount | 1957 Amount | (First 7 Mos.) 1958 Amount |
|---|---|---|---|---|
| U. S. Government | $ 770,000 | $ 473,000 | $ 13,862,000 | $18,857,000 |
| Government of D. C. | 3,000 | — | — | 6,000 |
| All Customers in D. C., except Gov't. of D. C. | 126,000 | 144,000 | 215,000 | 22,000 |
| State & Local Gov't. & their Agencies | 814,000 | 839,000 | 1,235,000 | 1,020,000 |
| National Accounts | 3,725,000 | 4,989,000 | 5,237,000 | 3,204,000 |
| Fleet Accounts | 37,084,000 | 43,804,000 | 42,392,000 | 28,860,000 |
| Distributors | 52,249,000 | 53,862,000 | 52,260,000 | 35,117,000 |
| Direct Dealers | 327,000 | 2,273,000 | 218,000 | 81,000 |
| Indirect Dealers | — | — | — | — |
| Fire Truck Buyers | 8,000 | — | 10,000 | 13,000 |
| All Other Buyers in U. S. | 7,822,000 | 9,726,000 | 12,042,000 | 5,519,000 |
| Total Sales by Defendant | $102,928,000 | $116,110,000 | $127,471,000 | $92,699,000 |