UNITED STATES of America, Plaintiff,

v.

ARNOLD, SCHWINN & CO., Schwinn Cycle Distributors Association, and the B. F. Goodrich Company, Defendants.

Civ. A. No. 59 C 489.

United States District Court
N. D. Illinois, E. D.
Jan. 25, 1965.

Earl A. Jinkinson, Joseph Prindaville, Kenneth H. Hanson, and Howard L. Fink, Dept. of Justice, Chicago, Ill., for plaintiff.

Charles M. Price, Harold D. Burgess, Robert C. Keck and James G. Hiering, MacLeish, Spray, Price & Underwood, Chicago, Ill., for Arnold, Schwinn & Co.

Earl E. Pollock, Wayne Hannah, Jr., and Michael M. Lyons; Sonnenschein, Levinson, Carlin, Nath & Rosenthal, Chicago, Ill., for Schwinn Cycle Distributors Assn.

Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., for B. F. Goodrich Co.

PERRY, District Judge.

This is a civil antitrust action, filed June 30, 1958, in the Eastern District of Missouri, Eastern Division. In March, 1959, on defendants' motion under 28 U.S.C. § 1404(a), this cause was transferred to this District.

The complaint herein was filed under Section 4 of the Sherman Act to prevent and restrain alleged continuing violations of Section 1 of the Act (15 U.S.C. § 1). It names three defendants: Arnold, Schwinn & Co., herein called "Schwinn"; The B. F. Goodrich Company, herein called "BFG"; and Schwinn Cycle Distributors Association, herein called "SCDA". It also alleges that corporations, associations and individuals not named as defendants participated as co-conspirators in the offenses charged.

The complaint alleges that, beginning with 1952 and continuing thereafter to the date of filing of the complaint, defendants and co-conspirators have engaged in an unlawful combination and

conspiracy, the substantial terms of which

"have been and are that: (a) A limited number of retailers in each market area will be franchised by defendant Schwinn, with concurrence of a wholesaler co-conspirator, for retailing Schwinn products; and each such wholesaler co-conspirator will confine his sales of Schwinn products to such franchised retailers only; (b) Defendant B. F. G. will confine its sales of Schwinn products to B. F. G. outlets only; (c) Franchised retailers and B. F. G. outlets in Missouri and in the other States of the United States will adhere to retail prices for Schwinn products fixed by defendant Schwinn; (d) Franchised retailers and B. F. G. outlets who fail to adhere to the prices fixed by Schwinn or who resell Schwinn products to non-authorized retail dealers will be reported to defendant Schwinn and will not be supplied by Schwinn, B. F. G., or wholesaler co-conspirators; (e) Each cycle wholesaler co-conspirator will be allocated a certain marketing territory, exclusive as to other cycle wholesaler co-conspirators, and will confine its Schwinn product sales to that territory;" and "(f) Each franchised retailer will purchase Schwinn products only from a wholesaler co-conspirator who is authorized to sell in his marketing area and will not sell Schwinn products from any location other than that for which he is specifically franchised."

The separate answers of each defendant denied each substantive allegation in the complaint, and at the trial the factual and legal bases of plaintiff's claims were sharply contested.

## FINDINGS OF FACT

The Court finds the following facts:

Schwinn is engaged in the manufacture and sale of bicycles, and, to a lesser degree, bicycle parts and accessories. It is a small family-owned corporation, with its only plant in Chicago, and is one of the oldest bicycle manufacturers in this country. Schwinn produces a wide variety of kinds and models of bicycles, and is primarily an assembler of bicycles producing the basic parts and purchasing others from parts producers. Schwinn's share of the U. S. bicycle market fell from 22.5 per cent in 1951 to 12.8 per cent in 1961. In the latter year, the largest domestic bicycle producer had a 21.8 per cent market share.

SCDA is an unincorporated association of distributors handling Schwinn bicycles and other products. Its members include cycle distributors and BFG, though no hardware jobbers or other distributors are members. Schwinn is not a member, but its representatives regularly attend SCDA meetings and participate in its meeting programs. SCDA has no office or employees. It normally holds two meetings of members a year, which consist primarily of a presentation of the Schwinn line and its sales and advertising plans. By that means Schwinn informs its principal distributors about its products and sales plans and obtains the distributors' opinions on models, model changes, and products salability. Such meetings also include presentations by parts suppliers and outside speakers on subjects of interest to cycle distributors.

BFG is a large producer of rubber and plastic products. It is also a distributor and retailer of such products and other merchandise manufactured by others, including Schwinn bicycles, through 450 company-owned stores and over 1000 independently owned franchised "auto and home supply" stores.

Shortly before trial, plaintiff and BFG presented the Court with a consent decree which was entered and became final on October 2, 1962. As a result, BFG did not participate in the trial. Neither Schwinn nor SCDA took part in negotiating that decree, and they are not bound in any way thereby.

Both before and during the trial of this action, plaintiff took the position that the complaint charged a combination and conspiracy "all aspects of which are so completely interwoven and inter-involved as to constitute one, over-all, nationwide combination and conspiracy" that is vertical· in nature, involving substantially everyone having anything to do with Schwinn's methods of distributing its bicycles during the pertinent period (1952–62). It contended that this alleged single over-all conspiracy included, in addition to the three named defendants, 17 Schwinn officers and employees; 89 wholesalers and jobbers of bicycles and 66 of their employees; the members of the Schwinn Bicycle Dealers Association of Greater St. Louis, Inc.; and all retailers of Schwinn bicycles in the United States who held a Schwinn franchise at any time during the pertinent period, or a total of about 12,700 co-conspirators. Its position was

" * * * that, where a manufacturer enters into an agreement with its independently owned distributors and with retailer organizations whereby, with the objective of fixing prices for certain products in both fair trade and free trade States, all sales are to be limited only to those retailers designated by the manufacturer (which retailers are required to sign fair trade contracts in fair trade States) and whereby all other retailers are to be boycotted and whereby an espionage system is set up to enforce such boycotting and price fixing and to determine that the retailers receiving said products adhere to the prices fixed and refrain from selling to other retailers not designated by the manufacturer, else they too would be boycotted, such an agreement violates Section 1 of the Sherman Act" (Ans. to Interrogatory E9).

In short, plaintiff contends that Schwinn's methods of distribution during the pertinent period, including allegedly unlawful price fixing and boy-cotting, were part of one nationwide agreement, and that such agreement was unlawful per se.

According to plaintiff, the relevant product market should be narrowly confined to the sale of Schwinn bicycles, Schwinn-made bicycle parts and accessories, and parts and accessories made by others that bear a "Schwinn Approved" label. Such a market involves only the intrabrand competition in the sale of such products between Schwinn wholesalers and retailers of Schwinn bicycles. It argues that evidence concerning interbrand competition between Schwinn and the many other brands of bicycles and bicycle parts and accessories sold in markets across the United States, and evidence concerning the stimulus of that broader interbrand competition in bringing about Schwinn's methods of distribution, are irrelevant.

From the outset, defendants denied participation in any price fixing, territory allocation, or group refusal to deal of an illegal nature, or in any alleged over-all agreement involving such practices. They contend that any restraints involved in Schwinn's marketing program are reasonably ancillary to its main and broader objective of waging more effective interbrand competition, through the small businessman dealers and distributors associated with it, with the larger, integrated sellers of bicycles, of both domestic and foreign origin, who during the pertinent period enjoyed from 77.5 to 87.1 per cent of all bicycle sales. It is defendants' postition that this cause is not concerned with the kind of restraints to which the per se exception to the rule of reason applies, and that defendants' conduct should be examined and analyzed against the background of the bicycle business generally in which they are engaged.

Schwinn's methods of distribution include the following: Schwinn bicycles reach retail dealers by Schwinn's (1) sales direct to retail dealers under the Schwinn Plan, in which Schwinn ships bicycles to the dealer, invoices the dealer, carries the credit, and pays a com-

mission to the distributor taking the order; (2) sales to distributors of various types, including cycle distributors, hardware jobbers and BFG, for resale to retail dealers; (3) drop shipments to retail dealers that are billed by Schwinn to the distributor originating the order; (4) sales on consignment through certain cycle distributors to retail dealers; (5) sales to retail dealers through Schwinn's agents in certain areas; and (6) sales to BFG and certain distributors for resale by them as retailers. During the 1952–62 period Schwinn engaged in selective distribution at the retail level through franchising retail dealers, and also at the wholesale level by designating for particular distributors areas of prime responsibility both for generating sales at wholesale of Schwinn products and receiving commissions on Schwinn Plan sales. During that period, Schwinn fair-traded certain Schwinn models at the retail level in States where fair-trading is lawful, and suggested retail prices for all its bicycles in non-fair-trade States and for non-fair-traded models in fair-trade States.

It is Schwinn's use of distributors in its marketing program that gives rise to the principal issues in this case. Therefore, the position and role of distributors in Schwinn's methods of distribution are of crucial importance.

Plaintiff's case is based on the premise that Schwinn's distributors are completely independent businesses; that Schwinn does not retain title to its products delivered to cycle distributors; and that Schwinn products are sold to the distributors and then resold by them to the retailers.

The facts are these: During the 1952–62 period and for many years prior thereto, well over half of the bicycles sold by Schwinn have been sold direct to the retail dealer (not to a cycle distributor) by means of Schwinn Plan sales and consignment and agency sales. Each of these methods of sale directly to the retailer by Schwinn was adopted for substantial business reasons.

In the 1930's cycle distributors began to develop a larger cycle volume than they could handle on their limited finances. When one became overextended, his business growing more rapidly than could be handled by his finances, Schwinn would suggest that he adopt the Schwinn Plan as a solution. This Plan worked well, freeing the bulk of that particular operator's operating capital for expansion of his parts and accessories business. It has been continually used by distributors since that time.

Under the Schwinn Plan, the jobber or distributor serving the area extends to the retailer the option of buying Schwinn bicycles either direct from the Schwinn factory under the Schwinn Plan or from the distributor's warehouse. When a dealer chooses to buy under the Schwinn Plan rather than from the cycle distributor's warehouse, the distributor forwards the order to the factory. Schwinn then ships the bicycle direct to the retailer, bills the retailer, extends him credit, and collects from him. Schwinn then pays a commission on such a sale to the cycle distributor equal to the difference between the distributor's cost and the Schwinn Plan price of the bicycle, both of which are established by Schwinn.

In such Schwinn Plan sales, Schwinn sells direct to the retail dealer. Thus, the cycle distributor and its salesmen serve in two capacities; as a Schwinn sales agent or representative in Schwinn Plan sales, and as a distributor's representative in other sales. The Schwinn Plan has been made available by Schwinn since the 1930's to its various dealer accounts, and that method of selling has been in wide use for years. Schwinn does not compel its distributors to use it, and a few have either not used it or have used it sparingly. Schwinn realizes the same price on a given bicycle whether sold to a retailer under the Schwinn Plan or to a distributor for resale from his warehouse. Schwinn Plan prices to dealers are invariably lower than out-of-warehouse prices. There is one less handling of the merchandise, i. e., the taking of the bicycles into the cycle distributor's ware-

house and shipping them out, which costs from $1.50 to $3.00 per bicycle. The lower Schwinn Plan price on direct factory shipments has led most retailers to purchase their basic inventory on the Schwinn Plan from Schwinn, and fill-in orders from the local distributor's warehouse stock.

Since 1950, Schwinn has used consignment selling for varying periods with nine cycle distributors, three of whom have converted the consignment arrangement to that of an agency. Each of these consignment contracts was entered into because the particular distributor needed help in carrying adequate stocks of Schwinn bicycles.

Functionally, under the consignment method, Schwinn ships its bicycles to the distributor's warehouse, carries them on its books and balance sheet and insures them. When the jobber withdraws the bicycles for delivery to a retail dealer, he remits the jobber price of the bicycles to Schwinn. Schwinn places the insurance on the consigned stock, and the consignee pays for it. Title to and right to immediate possession of all consigned bicycles and accessories, by contract, is vested in and remains in Schwinn as consignor until the full purchase price, less an agreed discount, if any, is paid by the cycle distributor.

Schwinn's agency method of selling grew out of the consignment arrangement. Three of Schwinn's cycle distributors were not operating profitably, largely because they were poor credit managers and had excessive inventories in relation to their sales. At different times in 1959 and 1960, Schwinn entered into an agency agreement with each of them with the idea of helping them in their business practices.

Under the agency agreement, Schwinn leases space in the cycle distributor's warehouse, ships its bicycles to that space, and carries them on its books and balance sheet and insures them. The cycle distributor handles the sales and invoices the bicycles to the dealer on a Schwinn invoice at the out-of-warehouse price fixed by Schwinn. Schwinn carries the credit, collects from the dealer, and pays a commission to the cycle distributor for its services, based on the bicycles sold.

Cycle distributors and wholesalers also sell to retail dealers from their warehouse stocks, usually for fill-in purposes. In such sales, Schwinn has nothing to do with the selling price. The availability of Schwinn products from such regional warehouses is of interest to Schwinn in ensuring quick service to its dealer customers. To a small extent, some factory drop shipments are made where Schwinn ships and the distributor does the billing, usually when there are dealer credit problems.

In 1962, Schwinn Plan sales alone amounted to slightly over half of all sales of Schwinn products, i. e., $9,953,000 out of total sales of $19,034,000. During the entire period, from 50 to 58 per cent of all Schwinn bicycle sales were made by Schwinn directly to retailers or to consumers, without title ever being in any wholesaler or distributor, the eleven-year average being 54.5 per cent.

During the same period, sales of Schwinn products to cycle distributors for resale amounted to 29.5 per cent of Schwinn's total sales, as compared to Schwinn Plan sales amounting to 38 per cent of Schwinn's total sales. Sales to hardware jobbers amounted to 4.5 per cent, consignment sales 7.5 per cent, and agency sales 1 per cent of the total sales of Schwinn products during that period. BFG sales were 13 per cent of the total sales of Schwinn products, 60 per cent of which, or 8 per cent of total Schwinn sales, were resold by BFG's own retail stores. Combination retailer-wholesaler purchasers accounted for 6.5 per cent of the total sales of Schwinn products, some of whom resold over 50 per cent of their Schwinn purchases at retail.

## THE PRICE FIXING ISSUE

Upon trial the plaintiff presented its evidence on the price-fixing charge, customer restriction through a franchise system and territorial divisions. It then

rested and objected to defendant introducing any evidence except in contravention of the plaintiff's testimony concerning price fixing. This objection was made upon the ground that price fixing is a per se violation and if proved the whole conspiracy charged is proved, relying upon U. S. v. Bausch & Lomb, 321 U.S. 707. The defendants asserted that not only would they offer evidence to meet the plaintiff's charge of price fixing and establish that they had not been guilty of price fixing or group boycotting, but that they would offer evidence to show that their actions in granting franchises with customer restrictions and assigning territories for distributors was reasonable, necessary and customary business procedure in order to survive as small business operators in a highly competitive field, and not in violation of any of the antitrust laws.

Counsel for the Government urged this court to follow the lead of the District Court in the Southern District of Ohio, United States v. White Motor Co., 194 F.Supp. 562, which in a recent opinion had just taken that course. A cursory reading of that decision revealed that there was no dispute about price fixing before that court. Price fixing stood admitted. This court then overruled the objection of plaintiff and permitted a full hearing to the defendants upon the defense of reasonable restraint and on all relevant factual issues, both economic and legal.

■ Counsel for plaintiff presented its evidence on the price-fixing charge first based upon the activities of the defendant Schwinn in fair trade states. Plaintiff's own evidence showed clearly that defendant Schwinn, unilaterally took legal action to protect its fair trade program; that it conducted shopping and followed other courses to enforce the law of the respective states in which it did business. The plaintiff's evidence revealed no action whatsoever of the other defendants in aiding or cooperating with Schwinn in its efforts of fair trade price enforcement. That evidence, together with the evidence adduced by the defendants clearly convinced the court that defendants were not guilty of price fixing in any of the fair trade states.

■ The plaintiff introduced evidence of instances where warning letters and comments had been made about dealers who were cutting prices below those fixed by agreements under the fair trade acts of their respective states. The plaintiff introduced evidence of 44 out of a total of 7018 cancellations of dealer franchises by Schwinn as being examples of cancellation of franchises for violation of fair trade agreement. This court has examined the evidence and finds that not one of them was cancelled for that reason alone, but that in each and every case one or more good reasons appeared for the cancellation of the franchise of the dealer. Over and beyond that, this court finds cancellation of a franchise for violating lawful agreements under the law of the state in which the dealer did business is not a violation of the antitrust law nor of any other Federal or State statute.

Next, the plaintiff presented evidence of the activities of defendants in free-trade states. The evidence presented covered three states: Nebraska, Texas and Missouri. That presented for Nebraska and Texas is de minimis. That presented for Missouri was extensive. However, such evidence, when balanced against that presented by the defendants, leaves the court no alternative but to find and the court does find that plaintiff has failed to prove by the greater weight of the evidence that the defendants were guilty of a price-fixing scheme in any of the free trade states.

The plaintiff presented five witnesses from the St. Louis area. All of them were or had been retail dealers. Witness Scharringhausen merely testified that Mr. Don Rehm, president of distributor Guaranty Cycle, said "that we should go along with the suggested retail price of Schwinn bicycle." He said he never recalled anything about taking franchises away from dealers who did not go along with suggested prices.

Witness Florman remembered oral talks of 1953 very vividly and in detail. Yet he could remember nothing of 1961. He testified of being threatened if he did not maintain prices, threats by Nielsen, Burch, Smith and Forrest, representatives of the defendants. He made memoranda of some of these talks, but nowhere in them appeared any of the statements of threats and price cutting to which he testified. His testimony was contradicted by Burch, Nielsen and Smith, who was one of plaintiff's own witnesses. The court finds Florman is not a credible witness. No attempt was made by plaintiff to offer sales slips showing at what price he sold bicycles. He was still franchised as a Schwinn dealer at two locations, even though he is a distributor for Columbia bicycles and at the same time a retail dealer for Columbia bicycles.

Witness Brandon testified that Forrest, a Guaranty Cycle salesman, called upon him in 1952 and told him that if he did not stop cutting prices he would lose his Schwinn franchise. His own next door neighbor testified that Forrest was not even employed by Guaranty Cycle at that time. On cross examination Brandon admitted that he was still franchised by Schwinn and also that his sales slips showed that he sold 50.6 per cent of his Schwinn bicycles below suggested price between the years 1956 and 1959, inclusive. He testified that he complained about Major Auto Supply Co., a competitor, because of price cutting and that not long afterward its franchise was cancelled. Schwinn's record showed Major Auto Supply Co., did have its franchise cancelled, but because it went out of the bicycle business, and not because of price cutting. He gave other testimony about joint advertising at suggested price. The court finds his testimony unreliable, and even if true not relevant.

Witness Gusoskey testified about being refused a renewal as a franchise dealer. In a letter to Schwinn he made this statement: "The reason he (Mr. Stan Kozy) gave me was that by pushing other bicycle sales, I spoke very lowly of your product. That I undersold and ridiculed the quality of the Schwinn bicycle. This I admit is the truth * * * I am very sorry and do hope you will accept my humblest apology for the trouble I have caused your company."

This quotation from letters from his own files came out on cross examination and revealed the very good reason Schwinn had for refusing him another franchise after his first one had been moved from its original location and he had changed his business name, thereby losing the franchise automatically in accordance with its written terms and provisions.

Witness Cohen testified about pressure to adhere to Schwinn-controlled retail price. His franchise was cancelled in November 1953 and on the witness stand he frankly conceded that he did not give equal representation to Schwinn in his store, which testimony coincided exactly with the reason given in Schwinn's records for this cancellation.

Witness Smith was a Guaranty Cycle salesman. He testified at great length about his activities as a salesman and telling dealers they had to hold the line or lose their franchise. He told of meetings that he attended in Chicago with Don Rehm and Schwinn officials. He stated that he was mostly loafing around and took no part in them, inasmuch as he was an employee of Don Rehm and was there as his aid or righthandman. The Schwinn officials denied his statements. At no time did Smith know of anyone who lost his franchise because of price cutting.

The plaintiff made much of the records of Schwinn concerning reports made by Mr. R. C. Appel, one of its employees who was assigned to make an investigation of Schwinn sales in Missouri and elsewhere. The court suggested that the plaintiff call Appel, who is still an employee of Schwinn. He was never called. The court has examined the evidence of the various reports and heard eighteen witnesses produced by defendants, whom Appel reports as having interviewed. The court heard an additional six. All

of these were from the St. Louis area. None of these men recall a visit from Appel. Not one of them knew him. Each one knew that Missouri was a free trade state. They completely contradicted his report. The record also shows that Schwinn made no use of the report. It was apparent that as a representative Appel had merely dropped in some of these places and had made a rosy report, apparently written up in a hotel room and of no weight as evidence in this case. The same worthless type of evidence was presented regarding other parts of Missouri, Texas, and Nebraska by Appel.

On the other hand the defendants' witnesses testified that they had at all times established their own retail prices; they all knew Missouri was a free trade state where Schwinn's fair trade prices were not effective; none of them had ever had Schwinn officials or distributors or representatives discuss prices with them; and each and all of them had regularly sold at less, or at more than the Schwinn suggested prices. During the 10 years from 1952 to 1961, inclusive, the witnesses who testified for the plaintiff sold 3180 bicycle units or 4.56 per cent of all of the sales in the St. Louis area. Contrasted with that the witnesses for the defendants sold in the same period 37,689 bicycles or 54.12 of all sales in the St. Louis area. In addition, eleven of defendants' witnesses produced their original sales slips showing that they had regularly sold at prices different than the Schwinn suggested prices. Not one instance of a record from the files of a retail dealer who had adhered to Schwinn suggested prices in Missouri or any other free trade state was offered into evidence. The court notes that the plaintiff designated but did not call as witnesses nine residents from Missouri and four from Texas.

This court considers it worthy to note that after exhaustive investigation by the Grand Jury for the Eastern Division of the Eastern District of Missouri at St. Louis, Missouri, a Grand Jury refused to indict these same defendants upon a conspiracy to fix prices after full investigation in 1957 and 1958.

Furthermore, the Federal Trade Commission initiated an investigation of the Schwinn franchising method beginning in the fall of 1953 and concluding on March 22, 1954. The investigation was closed by a letter from Mr. Joseph E. Sheehy, Director, Bureau of Anti-Monopoly, to Schwinn. The contents of this letter are as follows:

"This office has given consideration to the facts developed in a preliminary inquiry to determine whether Arnold, Schwinn & Co., Chicago, Illinois, and others have restrained trade in violation of Section 5 of the Federal Trade Commission Act by engaging in a conspiracy to boycott sales of bicycles and related parts and accessories to certain retail dealers in Milwaukee, Wisconsin.

"It appears that the evidence and information developed during the course of the investigation failed to provide a proper basis for further proceedings in this matter."

That grand jury investigation covered the period in which plaintiff charges the conspiracy had its inception, and most of the evidence thereof presented on trial. Neither of these two occurrences was conclusive, either as a matter of fact or law. Nor have either influenced this court in its findings and conclusions herein. They are mentioned to preserve for the record that this court does not stand alone in its findings herein.

The plaintiff has failed to prove the vital part of the price-fixing conspiracy upon which plaintiff has through counsel most diligently and fervently persisted. But dedication, sincerity and hard work cannot supply evidence. When a few witnesses come in and tell orally of fixed prices and threats, and then the records of actual sales come in literally from scores of retailers, the court has no alternative but to find there was no price-fixing scheme through a conspiracy between the defendants or otherwise. This

court is convinced and the record of the evidence shows that the defendant Schwinn devoutly hoped that its retail franchisees would hew close to the suggested price list, but it also shows that, whatever some officer or representative may have said or written, when retailers met competition in interbrand or even intrabrand bicycles, no action was taken by Schwinn or any of the distributors or agents of either. No one was refused bicycles and no franchises canceled. Price cutting was no doubt a factor in some cases where franchises of dealers in fair trade states were canceled, but in each case of franchise cancellation in evidence there was shown to be a more potent reason, and generally there were several other good and sufficient grounds for the cancellation.

The defendants are not charged with maintaining a monopoly. They are not charged with requiring their distributors or franchisees to give special or favored treatment to Schwinn products or to refrain from selling and dealing with anyone else. There is not one iota of proof of damages to any person, including the public. There is no charge of unfair business practices against any defendant. The record reveals scrupulous honesty and integrity on the part of Schwinn and all other defendants.

However, this court has been informed by all parties hereto that this is a pilot case and because of the tremendous costs to the Government and to the defendants, this court has concluded to make full and complete findings of fact and conclusions of law covering all of the issues of law and fact involved herein as a part of this opinion. This court is informed that the total cost of these proceedings to the defendant Schwinn is approximately $400,-000, for which there is no reimbursement. Undoubtedly the cost has been much greater for the Government. It is reasonable to assume that the total cost of this litigation will exceed $1,000,000 before it is concluded.

While the plaintiff has charged one overall conspiracy involving price fixing, customer restriction or group boycotting by franchising dealers and territorialization, this court finds that price-fixing charges are not a part of a general conspiracy. Fair trade agreements and price suggestions were first considered after the passage of the McGuire Act on July 14, 1952, and the first programs entered upon in March 1953. The evidence reveals and the court finds that the Schwinn franchising system was in effect in 23 of the 45 fair trade states when Schwinn began to fair trade some of its bicycles. The evidence reveals and the court finds that territorialization was a term used since 1930 and before by Schwinn to refer to areas covered by jobbers and wholesalers and that there was never any very serious controversy over conflicting territories until 1954, and then only concerning New York and Connecticut where distributor Levinson had covered both states, in the Philadelphia area where Nicetown covered the area outside of Pennsylvania and between four Midwest distributors, Chicago Cycle, Louisville Cycle, Columbus Cycle and Guaranty Cycle, which is hereinafter discussed more fully.

The plaintiff's credible evidence shows suspicion of price fixing but nothing more. The court is of the opinion that retail dealers, relying upon Schwinn suggested prices in free trade states, and fair trade prices in fair trade states, very often tell their customers that their prices are fixed by Schwinn. They use that as an excuse to avoid lowering their prices. But when that excuse fails they find some ruse, such as a trade-in allowance for any old wheel, and make a sale at the highest possible price. If there is no trade-in excuse, then they make the sale at a reduced price, often on a hush-hush basis to a very special customer, as of course each purchaser is. But each of the retail dealers knows that, whatever he may hear from other dealers, agents or distributors of Schwinn, his franchise and source of supplies will not be restricted as long as he produces sufficient sales as a retail dealer. Each of the Schwinn franchised retail dealers

knows that he is an unrestricted retail dealer, free to sell at his own price to any person who wants to buy on a retail basis. Each one of them knows also that he is not a wholesaler and that he cannot sell as a wholesaler or act as an agent for some other unfranchised dealer, such as a discount house retailer who has not been franchised as a dealer by Schwinn. When he acts as such an agent he subjects his franchise to cancellation at will by Schwinn.

### THE FRANCHISE ISSUE

This court cannot state the dilemma of a small business competing with giant chain stores in a highly competitive field, such as the bicycle industry, as well as it was stated by plaintiff's counsel, Mr. Earl A. Jinkinson. For that reason the court adopts and quotes:

"Every manufacturer, in deciding on a method of distribution of its products, is faced with a variety of choices, each having certain advantages and each possessing certain disadvantages. After having made its choice, however, a manufacturer may not embrace only the advantages of the system it has chosen and disclaim the disadvantages. It may not, in other words, operate free from the legal restrictions and regulations and from the practical operating burdens applicable to the system of its choice. In short, it may not both eat its cake and have it, too.

"In the instant case, Schwinn is a manufacturer of bicycles, parts, and accessories. As such, Schwinn could have elected to set up and operate retail stores for the sale of its products direct to bicycle consumers. Had it done so it would thereby have possessed the absolute right to open or close as many of such stores as it saw fit, and the equal right to an absolute control over the retail prices of the bicycles it would sell in such stores.

"Similarly, Schwinn could have elected to sell its products exclusively and directly to independent retail establishments without utilizing wholesale distributors as a middle layer in its distribution structure. Had it done so, it would thereby have reserved such rights and advantages as (1) picking and choosing those whom it desired to retail its products, (2) selling only to them, (3) 'franchising' only them, and (4) imposing 'fair trade' pricing on them in 'fair trade' States and suing for damages those retailers who undercut its 'fair trade' prices.

"On the other hand, if Schwinn had thus elected to operate its own retail stores, or to sell Schwinn products exclusively to independent retail establishments, it would have thereby incurred numerous disadvantages and burdens. For example, either system of distribution would have called for a very heavy capital outlay. One system would have involved Schwinn in maintaining supplies for and in operating not only its own retail stores but also branch warehouses from which to supply such stores. The other system of distribution would have involved Schwinn in maintaining supplies for and in operating a nationwide series of branch warehouses, together with an extensive sales force organized for the purpose of selling Schwinn products to independent retail establishments. Either system of distribution would have further burdened Schwinn with far-flung administrative, managerial, staffing, and fiscal problems from which it now stands relieved.

"Attractive as are the above-stated advantages which Schwinn could have lawfully reserved to itself under either of the above systems of distribution, Schwinn was unable or unwilling to assume the concomitant burdens of either of those systems. Therefore, Schwinn chose, by and large, to sell its products to wholesale distributors, each of whom entered into an agreement with Schwinn which stated that its relationship with Schwinn was that of 'an independent distributor and not that of an agent.'

"Schwinn having elected to sell its products to distributors thereby became subject to the rules of law which govern that relationship. One of the rules of that system of distribution is that a manufacturer's right to fix resale prices is sharply limited and restricted. An-

other of the rules under that system of distribution is that a manufacturer may not lawfully combine with anyone to restrict the customers to whom its purchasers may resell."

To put it bluntly, if Schwinn were Sears, Roebuck & Co., its largest bicycle competitor, or if it were General Motors Corporation, it would be able to do exactly what it has done in franchising retail dealers with no penalty attached either through its own retail stores and salesmen as Sears, Roebuck & Co. does or through direct franchising on a nation-wide scale as General Motors and other giant corporations do.

And penalized for what? Being a pygmy, compared to its giant bicycle competitors, Sears, Roebuck & Co., and Montgomery Ward & Co.? Yes, if the plaintiff's theory of the law applicable should be adopted by this court. Here, however, we do not even have the case of David and Goliath, where a well-directed stone from a slingshot might equalize the contestants. We do not even have the case of a pygmy pitted against a Cyclops, where a poison arrow might make competition a reality. What we do have is a microscopic Lilliputian whose extension ladders would not be able to mount the little toe of its Brobdingnagian foes.

Now it appears to this court that if General Motors, Sears, Roebuck & Co., Montgomery Ward & Co., Ford Motors Co., and other international corporations can rely upon a sound and long-established principle of common law and safely choose its customers, deal, and refuse to deal, with whomsoever it will, and whereever it will, so can a small business firm such as is Schwinn. There is another rule of law laid down and established at common law just as firmly as the aforesaid principle, and corollary to it: That is the rule of common law that generally what one may do himself he may likewise do by or through an agent. As a matter of fact and law that is how General Motors acts—by an officer.

Now that is also what Schwinn has done. In place of acting through a vice president, it has acted through a dis-

tributor. It has made agents of its distributors, in the same manner that it could make an agent of a corporate official, say its president or vice president, or other officer. True it may be that in some of its relationships with its distributors, it has dealt with them in another capacity. In some instances some of its distributors have bought merchandise outright from Schwinn and have become owners in their own right. In some instances they hold the merchandise on consignment. In those cases where a distributor has bought bicycles outright and taken title to them, certainly Schwinn could not prevent it from selling to any franchised dealer, no matter whether the dealer was in the territory assigned to the distributor or not. But in a case where Schwinn still has title to bicycles and the distributor is a mere agent—or salesman—Schwinn has the right to dispose of its own goods in the same manner as if the goods were in its own warehouse here in Chicago.

Neither is there any question but what Schwinn may lawfully contract with its distributors upon the condition that all of their sales shall be made to duly franchised retailers for the reason that its relationship with its distributors is that of agency and the sale is not made to the distributors for use but as an intermediate step to the retailer who sells to the public. Only the retailer buys outright and owns title and may sell to whom he chooses, but he may not use his retail franchise as a guise to become in fact an agent for a discount store or for wholesaling purposes.

The retailer under the Schwinn franchising plan buys to sell to the public and not to resell to another retailer who may not have adequate service or may not otherwise meet the approval of Schwinn. When a retailer enters into such activities he forfeits his rights under his franchise wherein he represents Schwinn in selling to the public.

It is unnecessary to discuss the development of franchises in the American business world. It is a fact of business life and by and large its effects are whole-

some and it furnishes a means for enterprising individuals and businesses to continue developing our competitive society along with all of the bigness of business. The bicycle industry is peculiarly adapted to the franchise system. Bicycles are not like toys that may be played with a few days and thrown away. They are like automobiles, a part of our urban life, a means of transportation for our youth in attending school and participating in community life both social and economic. Bicycles are in constant need of service. Hardware stores, department stores, and most other sales outlets do not furnish these services. Retail cycle outlets do. That is the type of business establishment that Schwinn has turned to as their local sales representatives.

By franchising the local cycle outlets and dealing with them only, Schwinn has remained in business and is still furnishing the best grade bicycle at prices now below those of 1951 and still making a profit. Schwinn has increased its sales and so have its distributors and retailers. It prides itself on being called the Cadillac of the bicycle industry.

Another feature of the franchising development is that dealers are not limited to any brand of bicycles, but usually are franchised by several makers of bicycles. At the same time they carry numerous other lines, such as toys, novelties and tools. Likewise the retail dealers usually carry several lines of bicycles. Of all the retail dealers who appeared in this case as witnesses, only two or three sold Schwinn bicycles exclusively.

 There is some evidence of a de minimis nature, about franchised dealers who acted as a funnel for discount houses who were not franchised by Schwinn and lost their franchises. The court does not find sufficient evidence to warrant it finding that such things did occur. In each instance where that is charged and where there has been cancellation of a franchise, there has been other good and sufficient reason therefor. Even if retail dealers had lost their franchises for selling wholesale to unfranchised dealers, it would be a lawful cancellation.

Suffice it to say that the court finds nothing in the actions of the defendants wherein they conspired to do any illegal acts contrary to the Sherman Act in their franchising activities.

## THE TERRITORIALIZATION ISSUE

The plaintiff charged and sought to prove that at all times since 1952 and until the trial herein that Schwinn, Schwinn Cycle Distributors Association and the distributors and dealers conspired to allocate territory between themselves and suppress competition by the distributors refraining from selling to any dealer except in his own allocated territory and the dealers refraining from buying from any distributors except those in whose allocated territory they carry on their business with Schwinn and that Schwinn was and is the enforcer of the conspiracy as well as a party to it.

The defendants denied that there ever was such a conspiracy and contended at all times, and still do, that there was never any such conspiracy or agreement and that through development of their business, territories were developed in accordance with natural boundaries, and were created by rivers, mountains, modes and methods of transportation, distance, urban and rural difference and other economic and social factors. They maintained, and still do, that no dealer is compelled to purchase from any particular distributor or, for that matter, from a distributor in his own area. They further contend, and still contend, that there were at all times and still are many places where there is more than one distributor or hardware wholesaler selling in the same area and that in fact there exists everywhere a free and competitive market between all of their distributors.

 The court finds the facts to be as follows:

The term "territorialization" has been in use by Schwinn since as early as 1930. By that time Cycle Distributors were already becoming a major factor in the distribution of bicycles by various manu-

facturers. But distribution was haphazard. The giant mail order houses had already become dominant powers in the sale of bicycles. Hardware wholesalers and jobbers still sold and distributed a large share of bicycles. There was still a very large distribution by direct sales to individual retailers all over the United States. Some of them were local hardware stores, others small general merchants, or toy stores. There was still another specialty type of merchant that like Topsy "just growed." That was the bicycle repair shop. When a customer needed repair or parts he sought out such a shop. And enterprising servicemen and repairmen began to see the opportunity to sell new bicycles; and lo, like the garagemen who developed into automobile dealers, these repair and service shops began to and naturally developed into bicycle dealers and merchants who sold both service and merchandise. In the beginning they bought from the mail order houses but soon found that it was better business to buy direct from the manufacturers. Then they found that for small quantities of bicycles and parts they could get quicker and more efficient service, at little more expense, by dealing with bicycle distributors who came to be known as cycle distributors. They found that by dealing with cycle distributors, they could get a variety of brands and interchangeable parts, which are made by other companies than bicycle manufacturers, who are in fact assemblers of bicycles and buy their parts from numerous parts manufacturers. However, the new retail bicycle merchants continued to buy directly from the various bicycle manufacturers, such as Schwinn, Monarch, Huffman, etc.

At the same time the mail order houses, such as Sears, Roebuck & Co., and Montgomery Ward, began to demand that their own brand names be placed upon the bicycles which they sold. In other words, when Schwinn sold bicycles to Sears, Roebuck & Co., the purchaser no longer bought a Schwinn bicycle, but a Sears bicycle. Schwinn had always prided itself upon making a quality product and was not willing to have its product equated with inferior products and to lose its identity with the public. Furthermore, the sale price that mail order houses sold bicycles for was such that Schwinn could only compete by using parts and material and workmanship in its manufactured products of an inferior grade, and by manufacturing a cheaper product. This Schwinn refused to do.

At that point, Schwinn had elected to discontinue sales to the large mail order houses. At the same time it found that hardware wholesalers were not a satisfactory outlet for its sales, for the reason that such wholesalers were selling and distributing not bicycles alone, but thousands of other products and that bicycles were an infinitesimal part of their business. Naturally, like Sears, Roebuck & Co., and Montgomery Ward, they had no salesmen who were specialists in the bicycle field and they furnished no service after the sale. They usually sold the bicycle in cartons, unassembled, and the purchaser, being no mechanic, often did not properly assemble the bicycle, causing much dissatisfaction and innumerable complaints.

At that point, about 1946, World War II ended, and with the spread of urban life from the cities a tremendous demand for bicycles arose. Schwinn was not alone among the bicycle manufacturers who began to search for a more efficient solution of distribution. Experts were called upon. The U.S. agencies were relied upon and studies were made of the problem. The experience of the automobile industry, which had preceded bicycles in this field and in other specialty products, had developed franchise and territory divisions to avoid ruinous competition and guarantee dealers a reasonable certainty of a source of supply and a sales area in which they could expect a market. The results were that dealers had been willing to and had made the investments of money, time and experience with good results.

The bicycle companies were not exactly in the same position as the large automobile companies. They did not

have the financing, and could not get it, to establish a system of direct franchising of retail dealers. The law was clear that the giant automobile companies could deal with one retailer in a community or area and refuse to sell to any other without running afoul of the law. That was and is a common law principle that has not in any way been modified by the Sherman Antitrust Act or any other act of Congress.

The problem was what should they do. The Schwinn officials, after consultation with the U.S. Department of Commerce, their legal counsel, and having special studies made by marketing experts, and even discussing procedures with the Federal Trade Commission, resolved that a system of dealing through cycle distributors and franchising retail dealers was the only solution remaining in order to enable them to remain in the business of manufacturing a quality product, the Schwinn Bicycle.

That was done as has previously been set forth. But that was not enough. There was the competition in price problem. That has been above discussed and that was resolved as above set forth. However, there still remained a problem. The more than 200 distributors throughout the United States were not producing sales in the manner that they should. Each of them sold or distributed numerous brands of bicycles and, of course, bicycles were only a small part of their business in many cases. Most sold or distributed everything for young people that rolled on a wheel, whether it was a limousine, tractor, trolley car, wagon, railroad car or a toy tricycle for baby's doll. In addition, they distributed tools and all sorts of mechanical devices, and various other diversified products. One of them testified that his bicycle business was from one to one and a half per cent of his gross sales. Others gave similar testimony, only varying in percentage, but in all cases the percentage of bicycle sales was relatively small, compared to gross sales. It must be borne in mind that this percentage covered all bicycles and there were then twelve domestic bi-

cycle manufacturers, and there are still eleven. Besides that there are innumerable imported makes that such distributors carried and still carry. Of course, no cycle distributor carried all makes of bicycles, but any self-respecting and progressive distributor carried an ample range of makes and prices to satisfy all of its customers. Some distributors pushed low-priced, and of course low quality bicycles, and ignored quality-priced and quality products in the bicycle field, such as Schwinn. That was true of distributors serving an area where the customers were predominantly wage earners or marginal farmers. Others who covered high income suburban or prosperous farm areas put their sales emphasis upon the quality product.

Schwinn determined to make a complete survey and study of the whole market and sales method, and that they did, beginning in 1946, and looking for the trends of the future.

What did they find? Of the 15,000 accounts they had upon their books several thousand had bought no bicycles in years. Yet advertising continued to be sent to them. A survey showed that 3,482 dealers had either gone out of business, died, discontinued selling bicycles or for some other reason were "dead accounts." These accounts were promptly purged. Then they found 40 per cent of the remainder bought less than three bicycles a year. Naturally, the overhead expense of such accounts exceeded the profit. They further found that more than half of their sales came from a very small percentage of dealers. And who were those dealers? Not hardware stores, not general merchants, not toy or novelty stores but the BFG Stores and bicycle specialists who provided ample parts and prompt and reliable service. Why not limit sales, whether direct or through distributors to those customers whose sales made it profitable for Schwinn? Was not the bicycle industry similar to that of the automobile? It seemed to Schwinn that a customer who buys a bicycle and can get repairs and service promptly and reasonably-priced

is going to provide a better market than one who buys a bicycle in a carton, spends a day assembling it, then makes some small error and finds he has a bicycle with a problem on his hands that cannot be solved by a letter to the manufacturer but must be taken to a mechanic, who himself may not be able to properly solve the assembly problem, and if he does, only for a price.

With these and other objectives in mind, Schwinn determined that it did not want Tom, Dick and Harry to be selling its product in a carton, collecting the price paid, "kissing the customer good-bye," depositing his profit and forgetting the customer, Schwinn, and the public generally.

So the franchising plan was adopted. Then there was the problem of eliminating those dealers who were not selling enough bicycles to pay the cost of carrying them on the books. In addition there was no encouragement to a dealer to become franchised and carry a fair inventory of Schwinn bicycles if across the street there was a competitor who was likewise franchised. So a further study was made and Schwinn chose those who by their record were best credit risks, made the most sales, and provided the best service for Schwinn bicycles. At this point it is worthy to note that it is not charged, nor is there a semblance of evidence, that Schwinn ever objected to the number of brands or makes of bicycles that a distributor carried, sold or distributed. Nor is there any intimation of any complaint about this question, although there is in the evidence numerous instances where Schwinn representatives complained that the Schwinn line was not adequately or fairly represented or was discriminated against. In most instances the evidence was admittedly or patently true. Schwinn's conduct in that respect certainly has been above reproach.

There is not one iota of evidence that Schwinn's franchise program has injured any dealer or any distributor, or has restrained trade in Schwinn's bicycles, or in any other bicycle, domestic or foreign. This whole suit is limited to intra-brand charges. The evidence is abundantly clear that Schwinn's practice of eliminating dead timber, useless and inactive or relatively inactive accounts, and persons and firms unable or unwilling to provide service and part replacements, and adopting and adhering to a franchise program instead of restraining trade in Schwinn bicycles, has greatly enhanced trade in Schwinn bicycles and has in fact been the salvation of Schwinn, just as it has been of other small businesses in this and other fields, and has actually made for genuine competition in the bicycle manufacturing industry.

Adequate service and repair is an absolute essential for any bicycle manufacturing company. If the retail sales agency of such a manufacturing company cannot or does not furnish such service the customer finds himself stranded. He must go to the serviceman and there he pays an additional premium and still does not get the service he is entitled to receive. The next time that customer is likely to look for a brand or make of bicycle where he can be assured of service, repairs and replacements. He will also make a similar recommendation to his friends. Thus, it is a most reasonable and sound business plan for a bicycle manufacturing company to limit its retail sales outlet to such a dealer. Service, repair and replacement of parts are therefore necessary adjuncts to the manufacture and sale of bicycles. What customer wants to go 50 or 100 miles for such service? Naturally, it should be and must be within easy reach of the customer.

Who but the manufacturer should pass upon whether the dealers are qualified to sell, service, repair and replace parts on Schwinn bicycles? The question answers itself. And how? Naturally by written authority, a franchise. Ergo, a franchise for retailers in such specialty fields as a bicycle is a business necessity.

After franchising was set up, however, another problem arose. That was the conflict between distributors in certain areas where they served the same or over-

lapping territories. A study of the problem revealed that there were only three cycle distributors who could be classified as nation-wide distributors. Those were Columbus Cycle, Louisville Cycle and Chicago Cycle.

In 1946, Chicago Cycle & Supply Company, a Chicago-based cycle distributor, sold Schwinn bicycles to 866 dealers in 37 States, from Washington to Florida and from Minnesota to Louisiana. While Chicago Cycle's sales were heavy across the Midwest, it was high-spotting the entire country, by sporadic salesmen's forays and by mail. Gradually, as Chicago Cycle began to draw in its far-ranging, haphazard sales efforts, its sales volume and that of the dealers whom it served increased strikingly. In 1952 Chicago Cycle sold in 33 States, with an annual per dealer unit average of 60 Schwinn bicycles. By 1962, it covered only 8 states, but the volume of its sales of Schwinn bicycles had more than doubled and the annual average units sold per dealer had increased from 60 to 150, a 150 per cent increase.

In 1946 Louisville Cycle & Supply Company, a Louisville, Kentucky-based cycle distributor, sold Schwinn bicycles to 460 dealers in 21 States. In 1952, Louisville sold in 19 widely scattered States, with an annual per dealer unit average of 26½ bicycles. Over the ensuing years, as the number of States it covered was reduced to 11, the volume of its sales of Schwinn bicycles increased over 160 per cent and the annual average units sold per dealer rose from 26.3 to 82.6 bicycles, a 215 per cent increase.

In 1946, Columbus Cycle & Supply Company, a Columbus, Ohio-based cycle distributor, sold Schwinn bicycles to 244 dealers in 16 States, from Kansas to New York and from Michigan to Georgia. In 1952 it sold in 10 States with an annual dealer unit average of 21.3 units. In the years that followed, the area it served was reduced to five states, but its volume of sales of Schwinn bicycles increased 230 per cent and the annual average units sold by each dealer quadrupled.

Schwinn did not coerce or bring about the reduction in the wide areas covered by these three distributors. They took this action themselves and generally reduced their sales of other products in a like manner. Schwinn's action concerning the division of certain borderline or overlapping counties in the territories of these distributors and Guaranty Cycle of St. Louis, Missouri, is discussed under the territorialization issue herein.

Schwinn's study revealed that these cycle distributors were duplicating work by sending salesmen into the same territory acting as Schwinn's agents. Schwinn's study and reports also showed that in New York, Connecticut and some of the Western states, the distributors were neglecting the territory they had traditionally sold in and that there was a need for making changes in the territories in which several distributors were selling. There was a total of twenty-two distributors throughout the United States and Schwinn determined that most of them needed no change in their territories.

Territories were not originally assigned to any of the Schwinn distributors. All of them had grown up individually by serving various manufacturing establishments and when they originally became Schwinn distributors they simply sold Schwinn bicycles in the territories they had built up in their business. Beginning in 1954 and 1955 Schwinn took notice of the conflict and made changes in the territories in the East, more particularly by taking away certain territory from Levinson in New York and Nicetown in Pennsylvania. The record is clear that these companies were not giving adequate attention to their Schwinn sales and Schwinn was justified in making the change that it did. The changes made throughout the United States were made by Schwinn alone. Some of the distributors accepted the changes with good grace and some did not, but the fact remains, and from the evidence is crystal clear, that accept the changes they did, one and all.

The record is also clear that as a result the sales of Schwinn bicycles increased in number for Schwinn itself and for the distributors. The record abounds with evidence of the increase of Schwinn sales, that was the result of concentrated selling in each distributor's own territory and the reduction of far-flung operations.

It is difficult to see how the dealers were injured and it is not so alleged and there is no evidence that would indicate that to be true.

Schwinn has developed a plan whereby a distributor may take orders and have the bicycle products shipped from Schwinn directly to the dealer with an invoice which is paid directly to Schwinn, who then sends the commission to the distributor. In a goodly number of cases, retail dealers send in orders direct to Schwinn for bicycles without waiting for a distributor's salesman or contacting the distributor. Schwinn, however, sends the standard commission to the distributor in whose area the order comes from. The retail dealer pays the same F. O. B. price no matter what distributor is credited with the sale. He does not get a reduced price by making a direct order to Schwinn.

Schwinn also ships bicycles to distributors who hold them in their warehouses on consignment or on an agency agreement. When a retail dealer places an order with a distributor, it may have the goods shipped directly to the retail dealer from Schwinn or it may withdraw them from its warehouse where they are held and of which Schwinn is the title owner. The distributor then remits payment to Schwinn, less its commission.

The evidence reveals that there are a number of areas covered by two distributors and many of the larger cities have two or more such distributors. There are also duplications in instances where BFG and hardware wholesalers compete with other distributors.

But the general picture is one of territorialization; one distributor for a general area, and one retail dealer for a particular locality. In larger cities the competing retail dealers are not ordinarily next door or across the street. They are appropriately spaced throughout different sectors of the city. All of which is sound economically and perfectly legal.

The defendants did not originally reach an agreement to divide up the market by themselves. Schwinn made studies and surveys and laid out the territories unilaterally.

Maps were prepared and given to distributors in many instances. The record of the trial is replete with evidence of the allocation of territory, not as prime areas of responsibility but as exclusive territory. Schwinn outlined Nicetown's district and took away from it the District of Columbia territory. On October 3, 1955, Frank V. Schwinn responding to a letter from Larry Metzger of Nicetown Cycle Co., said:

"Larry, there is no excuse for doing this. When you or any Nicetown people are selling bicycle parts and sundries other than Schwinn merchandise outside of your Schwinn territory and a dealer asks about Schwinn products, you can only answer that your Schwinn jobber franchise does not permit you to handle the order and that he should contact the Schwinn distributor handling the territory. You have no right to take * * * orders for Schwinn parts (from outside your territory). Your having done so only aggravates a situation which admittedly is not perfect, but is a situation we will handle in due course."

It so happened that Schwinn replaced Nicetown on December 1, 1955, less than two months after this occurrence. From a complete review of the evidence the court finds that Schwinn had good cause for such change and finds that the foregoing episode was not a controlling factor.

On January 1, 1956, Schwinn authorized Middle Atlantic Cycle & Supply

Company as a successor to Nicetown Cycle Co. In its letter authorizing Middle Atlantic Cycle & Supply Company, Schwinn stated:

"* * * effective January 1, 1956 Middle Atlantic Cycle and Supply Company will distribute Schwinn products to franchised Schwinn dealers within the territory outlined in the map attached hereto."

Mr. Charles M. Seiden, cycle distributor who succeeded Levinson in New York, testified that he was told by Frank V. Schwinn, president of Schwinn, Ray Burch and Paul Oberlin that, "We must abide by the territory that was designated to us and we must sell Schwinn products and bicycles only in those areas and not to overstep our bonds (sic)." He also testified that the same conditions applied to other distributors, that they must strictly remain in the territory that was given to them.

In a letter dated December 8, 1955, Frank V. Schwinn told Roy Seeholzer, a Schwinn field representative, about the territorial allocation of areas in Ohio, as it affected Chicago Cycle, Louisville Cycle, and Columbus Cycle and Supply Co. (a cycle distributor in Columbus, Ohio), as follows:

"* * * attached also is a map showing the areas in Ohio we will hold Chicago Cycle, Columbus and Louisville responsible for the sale of Schwinn bikes and Schwinn parts, effective January 1, 1956. On Schwinn products, they are to follow the line religiously. Dealers outside the line are to be referred to the respective jobber or the factory. Pop told them all personally— no exceptions."

The "Pop" referred to was Frank W. Schwinn.

The final determination of the territorial division between Chicago Cycle, Louisville Cycle, Guaranty Cycle, and Columbus Cycle was reduced to map form. Other Government exhibits show that in 1955 two or more of these same cycle distributors competed within the same geographical areas in Illinois, Indiana, Missouri, and Ohio. But after 1955, according to such Government exhibits, all (or virtually all) competition between them in such places had been eliminated.

In a letter to the U.S. Sporting Goods Company dated January 13, 1956, Frank W. Schwinn was very frank and blunt in expressing the fact that the territorialization program was designed primarily to eliminate competition between distributors:

"* * * In order to strengthen my franchising of dealers and control the number of dealers in any given area, I must allot areas exclusively to my wholesalers—this to protect the franchise idea and keep a lot of competing wholesalers in the same area from selling my bikes to whosoever they see fit."

The court finds a paragraph that was used in the first Schwinn agreements of 1952 and 1953 but which was stricken from the forms used after January 1954, and never again used. The paragraph reads substantially as follows:

"Dealer will * * * purchase bicycle parts and accessories from an authorized dealer in the area in which the dealer is located."

The Court finds, however, that in practice this paragraph was continued to be adhered to by the dealers and distributors.

The Court finds a quotation from a booklet published by Schwinn in 1957 which contained the following statement:

"5. REFUSAL TO ACCEPT ORDERS: Salesmen or distributors should not refuse to accept or give prompt handling to orders from franchised accounts located in the territory which he serves, except for credit reasons. Orders from outside this area should be returned with a note explaining that 'We do not service the area in which you are located,' and suggesting that the

dealer write the factory if he does not have the name and address of a Schwinn distributor serving his area."

While the foregoing provision was not a strict prohibition in so many words, it was understood by the distributors as such and has been generally carried out. The Court finds that certain cycle distributors have in fact not competed with each other, except in limited areas, for a number of years and that in so doing they have conspired with Schwinn to unreasonably restrain competition contrary to the provisions of Section 1 of the Sherman Act.

From and after 1952, territorialization was discussed with approval at most of the meetings of the Schwinn Cycle Distributors Association and that Association had knowledge of and agreed to the territorialization carried on by certain distributors who were members of the Association.

■ The Court finds that Schwinn has a right to assign primary responsibility to a distributor in an area or territory. Schwinn has a right, when it receives direct orders from a retail dealer in such territory, to pay its usual commission to the distributor in the territory in which such sale originated. When a distributor takes orders of Schwinn products and has them shipped directly to the Schwinn dealer, there is a fixed price, and then one distributor cannot offer to a dealer any advantage of price, service or reduced freight rates or shipping costs over that offered by another distributor. The distributor is truly an agent of Schwinn in such instances and Schwinn has a right to allocate its agents or salesmen to a particular territory.

■ However, when a distributor fills orders from warehouse stock that he has purchased, where he can set the price, and where there may be a differential in shipping costs or promptness or quality of service, he is acting as an owner and not as an agent or salesman for Schwinn. Where the ultimate risk and loss is borne by the distributor, as where he has purchased and taken title to the Schwinn products, he is truly an entrepreneur, or just a plain businessman.

It matters not that no actual damage has been shown to any distributor or dealer. Such division of territory by agreement between the distributors is horizontal in nature, and whether agreed upon after being imposed or even merely suggested from above in a vertical manner by the manufacturer does not alter its illegality and violation of Section 1 of the Sherman Act.

■ The Court finds that defendant. Schwinn and certain cycle distributors. that are members of the Association, together with the Association, were and are guilty of a conspiracy to divide certain borderline or overlapping counties. in the territories served by four Midwestern cycle distributors pursuant to. which such cycle distributors refused and refrained from competing between themselves in such areas, as to sales of merchandise which they had purchased and taken title, and that such acts are unreasonable restraints of trade in violation of Section 1 of the Sherman Act, and that said defendants should be restrained from continuing such acts and practices.

■ The Court finds that Schwinn has not been arbitrary in its conduct, though firm and resolute. The Court finds that the territories of distributors have in most instances not been changed from that in which they developed naturally and in which they have remained for the past thirty years. The Court further finds no grounds whatsoever for ordering or directing Schwinn to alter or change its territories for distributors. Neither does the Court find any grounds or reasons for in any way restraining Schwinn from continuing its policy of modifying its territories for prime responsibility in the future when it deems such action necessary.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of this cause and of the defendants herein under

the provisions of the Act of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act (15 U.S.C. § 1). The corporate defendants are and have been engaged in trade and commerce among the several States.

2. The plaintiff has failed to prove that defendants are guilty of a price-fixing scheme contrary to the provisions of Section 1 of the Sherman Act.

3. The Schwinn franchising system as shown by the evidence is reasonable, fair and good business procedure under all the circumstances existing in the bicycle industry. The defendants are not guilty of violating Section 1 of the Sherman Act in developing and carrying out such a franchising plan as the evidence shows has been developed and is in use by the defendants.

4. Schwinn has not been guilty of violating Section 1 of the Sherman Act in aiding other defendants to develop more efficient territorial zones and in allocating specific territories to distributors for prime responsibility and should be allowed to continue such activity. It is only in the agreements between Schwinn and certain cycle distributors to confine sales of Schwinn products, which the latter have purchased, to their respective prime responsibility territories that the defendants violated Section 1 of the Sherman Act as hereinafter set forth.

5. The written and oral contracts, agreements, and understandings between the defendant Schwinn, certain cycle distributors, who are members of the Association, and certain franchised retailers to the effect that the cycle distributors would confine their sales of purchased Schwinn products within designated separate territories constitute an unreasonable restraint of trade and commerce among the States, under Section 1 of the Sherman Act.

6. The defendants Schwinn and the Association have unreasonably restrained and the defendants Schwinn and the Association are now unreasonably restraining trade and commerce in the wholesale distribution and retail sale of Schwinn products by participating in the above-described agreements and understandings between themselves and with others in the manner described in Paragraph 5 hereof.

7. The foregoing restraints are unreasonable under Section 1 of the Sherman Act and are per se violations thereof.

8. The plaintiff is entitled to equitable relief against the defendants in the form of a restraining order restraining and prohibiting the defendants from continuing the unlawful agreements hereinabove set forth in accordance with the decree entered simultaneously herewith.